COMMONWEALTH *vs.* LINTON WHIPPLE, JR.

Worcester. February 6, 1979. — April 3, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Homicide. Practice, Criminal,* Capital case.

This court declined to exercise its powers under G. L. c. 278, § 33E, to set aside a verdict of murder in the first degree and direct the entry of a verdict of a lesser degree of guilt where there was proof of deliberate aggression carried out with a deadly weapon. [714-716]

INDICTMENTS found and returned in the Superior Court on September 16, 1977.

The cases were tried before *Garrity*, J.

*Margaret Hayman* for the defendant.

*Daniel F. Toomey*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant Linton Whipple, Jr., was found guilty by a Worcester County jury of murder in the first degree of Levi Taylor, assault and battery with a dangerous weapon on Armand Botch, assault with a dangerous weapon on Robert Ouellette, unauthorized possession of a firearm, and unauthorized possession of ammu-

nition.[1] The judge directed a verdict of not guilty on a charge of assault on Linda Fagan.

On this appeal pursuant to G. L. c. 278, §§ 33A-33G, the defendant does not suggest that legal error was committed during the trial proper or in the judge's instructions which, with respect to the homicide, would have permitted the jury, if they convicted, to bring in a verdict of either degree of murder or of manslaughter.[2] The sole submission is that, upon consideration of the whole case, some leniency is called for, and this court should exercise its sparingly used power under G. L. c. 278, § 33E, to set aside the verdict of murder in the first degree and direct the entry of a verdict of a lesser degree of guilt.

In the trial lasting seven days, evidence was received from eight eyewitnesses, including the three objects of the alleged assaults and the defendant himself. The medical examiner, a ballistics expert, and five police officers were also heard. We set out a summary of the case as it appears to us from the several accounts which in particulars were somewhat divergent, and then state our view about the § 33E application, concluding that it should be denied.

1. *Short account of the crimes.* Charles Murchison, driving his Chrysler automobile, met the defendant about 10:30 A.M., September 7, 1977, as the defendant was walking home from his place of employment in Fitchburg. The two went to Murchison's house and remained there until midafternoon, latterly in the company of Linda Fagan (the mother of one of the defendant's children), Earlene Murchison (Murchison's sister-in-law), and Melvin Baker. There was some substantial whiskey drinking by the men.

---

[1] Besides the mandatory life sentence for the murder, the defendant was sentenced to terms of three to five years on the several lesser offenses, these to run concurrently with the life term. Excepted was the ammunition conviction which by consent was placed on file.

[2] The judge instructed on self-defense, but no instruction was sought or given regarding use of excessive force in otherwise justifiable self-defense as a basis for a verdict of voluntary manslaughter.

About 3:30 P.M. the party, with the defendant at the wheel of the Chrysler, drove to the Polysar Resins plant in Leominister. Murchison was dropped there to begin work with his shift. (The defendant had formerly also worked at Polysar.) The party, minus Murchison, went on to Worcester in Murchison's car. There the women shopped for school clothes for Murchison's children, while the men remained in the car and drank whiskey. On the way back to Baker's house in Leominster, the defendant's driving became erratic and Baker took over. Arriving at Baker's, the defendant vomited. He was feeling the alcohol but was not drunk.[3] Baker ageed to meet the defendant later that night at a bar, "Frankie Dee's," in Fitchburg.

The defendant, with Fagan aboard, drove the Chrysler to Polysar about 9 P.M. intending to show Murchison the clothes and to borrow money from him. The car passed through the plant gate and stopped near a loading platform at building No. 3. Murchison came out of the building, followed by the victim, who had earlier indicated to Murchison that he wanted to talk to the defendant. (Ordinarily, the victim would have been gone, as his shift ended at 8 P.M.) Approaching the defendant, whom he knew well,[4] the victim asked him whether he had gone to the victim's brother's house, the intimation being that the defendant was renewing acquaintance with a former girl friend who was now attached to the brother. When the defendant answered, "What's it to you?", a minor fist fight developed between the two. It is not clear who started the fracas. The victim had the better of the fight, but no falls or substantial injuries were suffered. (The victim was about forty-two years of age, weighing over 200

---

[3] Murchison and the arresting State trooper both testified that the defendant was not drunk, although smelling of alcohol. The defendant said that by this time in the evening he had "lost count of what was happening."

[4] They had shared living quarters at one time.

pounds; the defendant twenty-seven years, about 145 pounds.)

Breaking loose from the encounter, the defendant ran toward the gate, but returned almost immediately. The victim seized a "two-by-four" from a pile of boards on the loading platform, swung it at the defendant and struck him twice, but with little apparent effect. The defendant said, "Go ahead and kill me"; to which the victim answered, "I don't want to kill you. I want to give you a message from my brother and you try to get bad with me." The victim replaced the two-by-four. In further conversation the defendant said he had been by the brother's house and had seen the woman. Desultory fighting resumed, with Murchison trying to cool the men.

About the time of the episode with the two-by-four — just when is not made clear — Fagan, at a direction from the defendant, had taken the defendant's .22 caliber pistol from under the front seat of the Chrysler where the defendant had placed it earlier that day. Now Fagan was standing near the car. The defendant approached Fagan and struck her, possibly in reaction to some expression by her about his meddling with the other woman. In a movement not clearly described in the testimony, the defendant took the weapon out of Fagan's hand or purse. He turned. The victim was then perhaps ten feet away. There was testimony that the victim was not moving toward the defendant, but some testimony to the contrary.[5] The defendant fired; the victim remained upright. Another shot a few seconds later brought him down. He fell forward,

---

[5] The defendant's version was that the victim came right up to him in a threatening manner, arm raised. Fagan had the victim approaching but not at such close range when shot. Murchison saw no forward movement; another witness, watching from inside a building some thirty-five yards away and catching only part of the total scene, said he saw the victim "coming towards Whipple" at some point after returning the board to the dock, and falling in this direction after the first shot was fired. Photographs and medical testimony as to a wound in the back, however, suggest the victim was not facing the defendant when the shot that felled him was fired.

away from the defendant, toward the gate. The defendant walked to the body, lying motionless with right cheek to the ground; holding the gun above the victim's head, the defendant fired three times.

There was some excited talk between Murchison and the defendant. Murchison ran into building No. 3 with the defendant pursuing, gun in hand. After a short interval, the defendant came out of the building. Another employee, Ouellette, perhaps with Murchison and two others,[6] also emerged. The defendant pointed his gun at Ouellette and pulled the trigger; there was no report. Then the defendant ran toward and through the gate. Fagan was at his side. Armand Botch, an employee, had just parked his car outside the gate. The defendant demanded Botch's car keys, then struck him on the head with the pistol. Botch fell. Just then, Baker drew up at the gate in a Cadillac automobile. The defendant and Fagan jumped into that car. Within fifteen minutes the car was stopped by a State trooper and the defendant was placed under arrest.[7]

The pistol used in the shooting was recovered from a wooded area beside a road in Shirley where it had been thrown from the Cadillac moments before the stop and arrest. At the scene near the body were found five live .22 caliber bullets which, by the defendant's admission, had dropped from his pocket during the melee. Five spent bullets were recovered from the body during autopsy. The medical examiner described five entrance wounds: one at the upper back, slightly to the left of the spine; a second

---

[6] Only Fagan and the defendant saw this group emerge. Ouellette testified to his own appearance outside but did not mention the presence or absence of others.

[7] The defendant's testimony, vague at some points, did not contradict the substance of the evidence as we have described it, except on the matter of the victim's proximity and posture when the first shots were fired, and on chasing Murchison into building No. 3. See note 5, *supra.* His memory lapsed, however, about calling to Fagan for the gun.

at the left side in the area of the lower chest; three at the left temple (two of these wounds were so close together as to make a single breach). The examiner testified that, judging by the quantities of blood caused by or surrounding the projectiles, the spinal wound was probably inflicted first; and that one of the head wounds was the "ultimate cause of death," although the penetration of the lung by the bullet to the back would also have proved fatal.

2. *Considerations relevant to § 33E relief.* The fact that the defendant secreted a weapon in Murchison's car, and the further fact that he was met conveniently by Baker after the shooting, might possibly suggest that the homicide was long planned. That view of the case, however, is belied by a number of circumstances. No particular explanation is offered for the planting of the gun. On the other hand, there was a plausible innocent reason for the arrival of the defendant and Fagan at Polysar in the evening, and the victim's presence at Polysar at that time was a fortuity. Baker may well have turned up at the gate, without criminal prearrangement, to convey the defendant and his companion to Frankie Dee's.

Accepting, however, that the homicide was not long planned, it could still amount to murder in the first degree, for the period of premeditation need not be an extended one. *Commonwealth* v. *Tucker*, 189 Mass. 457, 494-495 (1905). And although a condition of drunkenness may be so severe as to render premeditation impossible, the intoxication appearing on this record was not nearly so extreme. *Commonwealth* v. *Doyle, ante* 132, 136-137, 140 (1979). *Commonwealth* v. *Parsons*, 195 Mass. 560, 571 (1907).

In pleading for treatment of the homicide as murder in the second degree or as manslaughter, the defendant seems to submit that, while premeditation (and malice) there may have been, the facts taken in "a large or nontechnical sense," *Commonwealth* v. *Bowman*, 373 Mass. 760, 765 (1977), are amenable to the interpretation that

the killing was less an assassination than the result of blind passion or a defensive reaction, or perhaps a combination of the two, anger and fear being somewhat compounded and heightened by drink. The evidence, in our view, is to the contrary: there is plenty of proof of deliberate aggression carried out with a deadly weapon.

The defendant disengaged after the initial encounter, but then he chose to return. Even so there was no serious injury at any point from the blows exchanged, and no threat of serious injury at least after the two-by-four was discarded. The pitch and tempo of the dispute were by no means frenzied. Yet the defendant signalled for a gun and finally discharged it point-blank at the unarmed victim. Indeed, if the medical evidence is credited, the first bullet struck the victim when he was already facing away and in retreat from the defendant.[8] In the defendant's taking up of the gun, the present case resembles those in which a defendant, party to a dispute or affray, leaves the scene, procures a weapon, and returns to do murderous work: there we have regularly denied § 33E relief. *Commonwealth* v. *Stillwell*, 366 Mass. 1 (1974), cert. denied sub nom. *McAlister* v. *Massachusetts*, 419 U.S. 1115 (1975). *Commonwealth* v. *Pratt*, 360 Mass. 708 (1972). The actions of the present defendant after he brought the victim down — the repeated shots to the victim's head and the violent escape — confirm the impression of an attack with design to kill, studied, although formed in a short interval of time. This is indeed a case of a "senseless brawl" ending in death; but, as distinguished from cases of that sort where on occasion a reduction of sentence has seemed appropriate, the present has elements of criminal intention that argue against the exercise of § 33E powers. Cf. *Commonwealth* v. *King*, 374 Mass. 501 (1978).[9] The

---

[8] Photographs of the victim's position on the ground also support the view that the victim had his back to the defendant, but eyewitness testimony is either to the contrary or ambiguous on the point.

[9] The judge's omission to charge on excessive use of force in other-

jury found the defendant guilty of murder in the first degree although lesser verdicts were open to them under the judge's instructions. We do not disturb their election.

*Judgments affirmed.*

wise justifiable self-defense (see note 2, *supra)* is a factor for consideration on § 33E review. In a close case it might tilt a jury unfairly toward a higher degree of guilt. See *Commonwealth* v. *Rego,* 360 Mass. 385, 394-396 (1971). We do not regard this case as close. The defendant's tale of self-defense exercised as the victim lunged at him with arm raised is hard to believe and contradicted by other testimony (including that of Fagan, the other defense witness). Also, the defendant had ample avenues of retreat.