## COMMONWEALTH vs. KEVIN BRAY.

Middlesex. December 19, 1984. — May 1, 1985.

Present: SMITH, KAPLAN, & WARNER, JJ.

*Homicide. Evidence,* State of mind, Relevancy and materiality, Other offense, Prior inconsistent statement, Record of past knowledge, Previous testimony of unavailable witness, Consciousness of guilt, Questioning of witness by judge, Photograph. *Witness,* Unavailability. *Practice, Criminal,* Questioning of witness by judge, Instructions to jury, Argument by prosecutor, Conduct of prosecutor. *Self-Defense.*

At the trial of a defendant charged with murder and other serious crimes arising out of a brawl between two groups of youths, the judge did not err in admitting testimony that, immediately before encountering the victim and the two young men accompanying him, the defendant, "somewhat intoxicated," had had an altercation with another youth and shoved him in the chest. [757]

At a criminal trial, the transcript of a witness's testimony at the defendant's probable cause hearing, to the effect that the defendant said he hit the victim with a bat, could not properly be admitted in evidence under the principle of "past recollection recorded," in view of the witness's trial testimony that he could not remember the defendant's statement and, further, that he did not know that his memory was better at the probable cause hearing than at trial. [757-758]

A witness's lack of memory of the testimony he had given at a defendant's probable cause hearing did not, under evidentiary rules prevailing at the time of a criminal trial, render the witness "unavailable" so as to permit his testimony at the hearing to be admitted in evidence without limiting instructions; however, in view of the cumulative nature of the witness's testimony at the probable cause hearing, the trial judge's error in so admitting it did not require reversal of the defendant's convictions. [758-759]

At a murder trial, testimony that the defendant and three other youths had met together a few days after a brawl in which the victim had been killed, and that they had agreed on a statement they would make to police, was properly admitted in evidence as tending to show consciousness of guilt. [759]

In the circumstances of a murder trial in which one witness had admitted to having made false statements to police on earlier occasions, the judge's

question, "Now, have you told us the truth here today as best you can?" and the witness's affirmative answer, did not display partisanship or bias of the judge. [759-760]

In the context of a criminal trial, a police officer's testimony referring to "mug shots" and suggesting that the police had possessed a photograph of the defendant was adequately dealt with by the judge's striking the testimony and by his curative instructions to the jury. [760-761]

In the circumstances of a murder trial, there was no material error in the judge's declining to instruct the jury with specific reference to certain incorrect remarks by the prosecutor in closing argument concerning the availability of a claim of self-defense, where the judge's charge correctly stated the principle of self-defense and informed the jury more than once that the charge prevailed over anything counsel might have said. [761-762]

At the murder trial of a defendant accused of killing the victim with a baseball bat, the evidence did not warrant an instruction to the jury with respect to involuntary manslaughter. [762]

The evidence at the trial of criminal charges arising from a brawl between two groups of youths was sufficient to warrant the jury in finding the defendant guilty of murder in the second degree and the judge's denial of the defendant's posttrial motion pursuant to Mass.R.Crim.P. 25 (b) (2). [762-763]

The circumstances of a murder trial did not indicate bad faith by the Commonwealth on the ground that it had obtained an indictment for a more serious crime than it expected to prove. [763-764]

INDICTMENTS found and returned in the Superior Court Department on December 23, 1982.

The cases were tried before *Robert J. Hallisey,* J.

*Barry P. Wilson (Linda H. Morton* with him) for the defendant.

*Karen J. Kepler,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Upon indictments for first degree murder and two related charges of assault and battery by means of a dangerous weapon, to wit, a baseball bat, the defendant Bray after a lengthy trial was convicted of murder in the second degree and of both related charges.[1] The trial, we hold, was fair although not perfect, and the judgments will be affirmed.

---

[1] He was sentenced to life imprisonment for the murder and to four to six and seven to nine years for the other charges, respectively, all sentences to be served concurrently.

1. *Narrative.* Leaving some details for later points, we recount the facts as the jury could have found them.

The victim, twenty-two year old Robert Ryan, was at a party in Malden on Saturday night, August 14, 1982. The party had been noisy and alcoholic; the police came shortly after midnight to quiet it. Between 12:30 and 1:00 A.M. the victim left in the company of his friends Robert Madden (aged 17) and Keith Moscone (18). Madden had had four or five beers, Moscone ten. The evidence did not disclose whether the victim had been drinking. Madden drove his mother's 1977 Buick Electra automobile. The three went to Everett to visit Madden's girlfriend, planning to return thereafter to the party. On their way back from the visit, they passed by the corner of Cherry and Ferry Streets, Everett, a hangout for young people.

Assembled there, standing on the sidewalk by a parked car near a street lamp, were the defendant Bray (22) and his friends Joe Rossi (23), Frank Russell (22), John O'Connor (22), and, seated in the parked Audi car belonging to her, Delores Ross (20), Rossi's girlfriend. All were from Everett.

The young men just named, excepting the defendant, together with Ross and O'Connor's sister Tracy,[2] had met earlier in the evening and gone out in Ross's car, stopping at a number of bars and a liquor store.[3] The defendant had spied the group in the car around 9:00 P.M. as he was walking down Ferry Street. He signalled them to stop; they saw him but drove on. When, between 1:00 and 1:30 A.M., the defendant walked to the corner of Cherry and Ferry and encountered them, he displayed anger because they had not stopped for him, called them "scum," and yelled at them despite O'Connor's explanation that the Audi car had been full. The defendant had been drinking. He shoved O'Connor in the chest. Rossi and Russell had to step in to separate the two. It was at this point that the Electra drove up.

---

[2] Tracy O'Connor went home before the fatal incident.

Other than the defendant, all the persons mentioned to this point (of the Everett as well as the Malden group) were called by the prosecution. The defense rested at the close of the Commonwealth's case.

[3] The five had drunk varying amounts; Ross said she had had but one drink that entire evening.

Madden, thinking there might be friends of his at the corner, parked the Electra on the other side of the street from the Audi, and all three alighted from the car and walked toward the Everett group. In fact no one of either group knew any of the other. Madden asked whether anyone had seen two friends of his, Nooter and Leo by name. It appears that these fellows were known to one or another of the Everett group, but the answer Madden got from the defendant was: "Get the fuck out of here before we fucking kill ya."[4] Someone — either Rossi or Russell — also said, "They're not here. Move along. Screw." Madden said, "Who the hell are you? No one talks to me like that." During this exchange the victim stood either on the sidewalk near Madden or leaning against the Audi. Madden retreated to his car and drew out one or two baseball bats (witnesses differed).[5] Ross got out of the car when she saw Madden return. There were more words between Madden and the Everett men.

The defendant wrested one of the bats from Madden. O'Connor grabbed at the other bat, but Madden held on; the two were locked on the bat and their struggle carried them into the street. Russell and Rossi set upon Madden with blows to the face. Madden yelled to the victim for help but there was no response. O'Connor joined in beating Madden. Madden lost his grip on the bat, staggered back, and apparently blacked out. Moscone, standing a few paces from Madden, shouted at the victim that they should get out of there, also without response.

---

[4] Rossi and Russell testified that they answered Madden and had said, "Get the fuck out of here." This testimony was not exclusive or contradictory of the attribution to the defendant.

[5] Did Madden retrieve one or two bats? Madden and Moscone said one — there was only one in the car.

Police Inspector Henry Meoli testified that the defendant said in an interview there were two bats; and O'Connor and Russell testified similarly, as did Rossi. Ross at a probable cause hearing testified to two; at trial she wavered between one and two. O'Connor said Madden came forward with two bats, crossed, in one hand. Russell said Madden was swinging wildly, a bat in each hand. No bat was recovered.

Only Ross and Rossi testified to having seen what happened to the victim.[6] According to them, the defendant (six-feet, two-inches tall, 210 pounds), holding a bat, squared off against the victim (taller but leaner by 20 pounds than the defendant). This was on the sidewalk a few feet from the Audi. The men were four or five feet apart. About a foot behind the victim and running the length of the sidewalk was a high cyclone fence. The victim Ryan stood with his arms at his sides, making no move toward the defendant. It was then Rossi noticed the victim was holding a tire iron in his right hand.

The defendant and the victim stood facing each other for several seconds. Then, according to both Rossi and Ross, the defendant swung the bat and caught the victim behind his left kneecap. Now Ross, too, noticed the tire iron.[7] As the victim began to raise the iron, the defendant raised the bat and drew it back just below his shoulder. When the tire iron reached a point between the victim's waist and shoulder, the defendant took an overhand swing. The bat struck the left side of the victim's head just above the ear. Ross screamed as she heard the sound of impact. The victim's knees buckled. He took no steps, but pitched face forward.

Rossi told Ross to get out of there, and she got into her car. Moscone and Russell were fighting on the ground in front of that car, and Rossi headed there to help Russell. Ross backed her car and, as she was driving away, the defendant jumped into the back seat and told her to take him to Glendale Park, a few minutes away. Rossi and Russell together overcame Moscone and left him "out cold," lying face down on the street.

---

[6] Russell testified he saw the defendant take the bat but never saw him strike the victim. There was evidence tending to show that all except Ross and Rossi were so situated when the victim was struck that they would not have observed that part of the fracas.

[7] Only Rossi and Ross testified to seeing the tire iron. Ross said she had seen it previously while seated in her parked car. One of the Malden three came over to the car and, holding a tire iron behind him, leaned his back against the car. Madden testified that a tire iron could not have come out of his car as someone had stolen the car a month earlier and stripped it of the iron and other things. Like the bat or bats, no tire iron was recovered.

The victim got back on his feet and made his way toward the Electra. Russell testified that as he passed by, the victim threw a punch at him and said, "We're going to come back and get yas." Russell blocked the punch and hit the victim with his right fist just above the left eyebrow with a force about 75 percent of his maximum. The victim began to crumple. Russell continued with four or five more punches to the victim's upper body. The victim leaned against the car, crouching, while he took Russell's punches. He said, "Don't hit me no more." Russell stopped and walked away.

O'Connor, meanwhile, had dragged Moscone over to the Electra. The victim helped O'Connor get Moscone into the car. He took the driver's seat. O'Connor told him to go. The victim said, "Don't hit us no more." O'Connor left. Not having the car keys — they were with Madden — the victim could not drive off. After several minutes a police officer, Robert Colasanti, appeared, led there by Madden, who had managed to stumble down Ferry Street to the officer's cruiser. The victim now appeared dazed. His speech was slurred. He had a gash, with swelling, over one eye. Officer Colasanti used his cruiser to take the three — Madden, the victim, and the still groggy Moscone — to Whidden Memorial Hospital. There Moscone came to and all were cleaned up. The three left with Madden at the wheel of the Electra, which another officer had driven to the hospital. The victim was left off at his house. It was around 3:00 A.M.

About 9:30 A.M., the victim's sister Patricia came into his room. He was sitting in bed, bent over. He was wearing clothes of the night before. His shirt was bloodied. His face was badly swollen, his eyes glassy, one blackened. The family took him to New England Memorial Hospital, reaching there about 11:00 A.M. By then he was unresponsive. Emergency brain surgery was performed, but he lapsed into coma and required a respirator. After fifteen days on the machine, he died.

The attending neurosurgeon, Dr. Robert Valin, and a forensic pathologist, Dr. George Katsas, attributed death to brain swelling and subdural hematoma resulting from severe head trauma. Defense counsel attempted on cross-examination to

show that the cause might have been the blow delivered by Russell, but the medical evidence pointed to the blow with the bat.

2. *Rulings in course of trial.* (a) Was it error to admit over defense objection John O'Connor's testimony that, immediately before the Malden car arrived, the defendant, "somewhat intoxicated," had an altercation with O'Connor and shoved him in the chest? The shoving episode could not be rightly admitted to show that the defendant had a violent character or a general propensity for violence. See *Commonwealth* v. *Hoffer,* 375 Mass. 369, 372 (1978); 1A Wigmore, Evidence § 54.1, at 1152 (Tillers rev. 1983). On the other hand, it could be introduced as tending to prove the defendant's condition and frame of mind as, in a virtual continuum, he passed from going after O'Connor to provoking the brawl with the Malden youths by his words and seizing the bat. The specific quo animo bore upon an essential of certain of the crimes charged. See *Commonwealth* v. *Connor,* 392 Mass. 838, 852 (1984). Cf. *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 816 (1973). The case is easily distinguished from those where "prior bad acts" have no or very minor probative relation to any issue of fact. See *Commonwealth* v. *Spare,* 353 Mass. 263, 267 (1976); *Commonwealth* v. *Parker,* 12 Mass. App. Ct. 955, 956 (1981); *Commonwealth* v. *Yelle, ante* 465, 471-472 (1985). Nor is there any serious problem here of weighing possible unfair prejudice against legitimate probative value in deciding the question of admissibility, as in *Commonwealth* v. *Blow,* 362 Mass. 196, 200-201 (1972); *Commonwealth* v. *Gallison,* 383 Mass. 659, 672-674 (1981).

(b) On direct examination the witness John O'Connor testified that, immediately after the fight, the defendant and the other Everett youths gathered at Glendale Park. O'Connor at first denied that the defendant said at the time that he hit the victim with a bat; but when the prosecutor pressed him, he backed off somewhat and said he could not remember whether the defendant used the word "bat." Over objection, the Commonwealth was allowed to read in evidence, without a limiting instruction, O'Connor's testimony at a probable cause hearing

that the defendant said at Glendale Park that he had hit the victim Ryan with a bat. After reflection the judge thought the testimony could not be received as "past recollection recorded" because O'Connor was now saying from the stand that he could not remember what the defendant said at Glendale Park and, further, that he did not know that his memory was better at the probable cause hearing than now (thus declining to accept the prior record as accurate). See *Commonwealth* v. *Bookman,* 386 Mass. 657, 663-664 (1982); *Commonwealth* v. *Daye,* 393 Mass. 55, 64-65 (1984); Liacos, Massachusetts Evidence 92-94 (5th ed. 1981); Fed. R. Evid. 803(5); Proposed Mass. R. Evid. 803(5) (July, 1980).[8] The judge decided that the testimony could be received without limitation as prior recorded statements, given under oath and subject to cross-examination, of a witness who was now "unavailable" in the sense that he asserted from the stand that he did not remember those statements. "Unavailability" is indeed stretched that far under Federal rule 804(a) and proposed Massachusetts rule 804(a), but under our current law the declarant must be dead or have disappeared at the time of trial or, although present, must have invoked a valid claim of privilege. See *Commonwealth* v. *DiPietro,* 373 Mass. 369, 380-382 (1977); Liacos, *supra* at 273-274.

The defense acknowledges that O'Connor's prior testimony could be allowed in the accustomed manner simply as prior inconsistent statements (no showing of "surprise" would be needed, see *Brooks* v. *Weeks,* 121 Mass. 433, 434-435 [1977], and G. L. c. 233, § 23), but the judge on that view would be required to limit it to the purpose of impeachment, which he refused to do.[9] However, we think the error was not a grave one

---

[8] O'Connor's disclaimer of recollection aborted the use of his prior testimony to "refresh recollection."

[9] The defense does not urge, under *Commonwealth* v. *Chin Kee,* 283 Mass. 248, 261 (1933), that the prior testimony was not "inconsistent" because, in strictness, that testimony did not contradict the witness's in-court statement that he did not remember. There is sufficient inconsistency where the witness starts with a contradiction, as here, and then retreats to a claim of lack of memory. See *Commonwealth* v. *Reddick,* 372 Mass. 460, 463 (1977); *Commonwealth* v. *Cobb,* 379 Mass. 456, 462-464 (1980).

and in its relation to the substance and scale of the entire trial may properly be overlooked. For the evidence, received without restriction, was merely cumulative upon other proof that the defendant had struck the victim with the bat.[10]

(c) Joe Rossi testified over objection that he, Russell, O'Connor, and the defendant returned to Glendale Park for a second meeting, a few days after the event, and agreed they would tell the police they joined in the fight but would say nothing about the bat. The defendant was shown to have joined in the agreement through the further statement by Rossi (not objected to) that "we all put in a part." This testimony about a confederacy of silence about the bat was not irrelevant, as the defense protested; it tended to show consciousness of guilt. See *Commonwealth* v. *Basch*, 386 Mass. 620, 624-625 (1982) (defendant's intentionally false statements admitted on this basis); *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983).[11]

(d) There was testimony tending to show that of the Everett group, Joe Rossi and the defendant, at least, did abide by the

---

[10] We may note that the inconsistent prior testimony might be admitted unreservedly by reference to the doctrine lately announced in *Commonwealth* v. *Daye*, 393 Mass. at 75. This is comparable to Federal rule 801 (d) (1) (A) (equating with Proposed Mass. R. Evid. 801[d] [1] [A]): A statement is not hearsay where "[t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is . . . inconsistent with his testimony, and was given under oath . . . at a trial, hearing, or other proceeding . . . ." The difficulty in the present case is that the *Daye* rule has apparently been given only prospective application. 393 Mass. at 65, 75.

[11] Rossi testified about a third meeting at Glendale Park at which he and the defendant discussed the arrest of Frank Russell which had occurred several days after the fight. Over objection, Rossi was permitted to testify that he had suggested, "Let's go to Malden Court and help Frankie out." The prosecutor asked Rossi, now without objection, for the defendant's response. The defendant had answered, "His father's got money, he can get him out of it." A reluctance to go to the authorities or to offer to testify at Malden, a preference for letting another take the heat, would have some remote tendency to show consciousness of guilt on the defendant's part, but might be open to explanation in various other ways. Cf. *Commonwealth* v. *Nickerson*, 386 Mass. 54, 59 (1982). At all events, coming as it did in the course of Rossi's running account of what befell the Everett group, the report of the defendant's remark would not, we think, have produced much of an impression on the jury.

agreement just mentioned. In particular, Rossi admitted stating falsely to the police on several occasions — he could not remember how many — that there was no bat. However, on the day the victim Ryan died, Rossi went to the police, so he testified, and told them the truth. As Rossi concluded his testimony, both direct and cross, the judge said, "Now, have you told us the truth here today as best you can?" Counsel objected to the question, but Rossi was allowed to answer, "Yes, sir." The witness then stepped down. Denying a request that he instruct the jury to disregard the question and answer, the judge cautioned the jury to give no more weight to the evidence elicited by the court's questions than by counsel's.

The defense argues that in this episode the judge in a sense reinforced Rossi's credibility and thereby aligned himself with the prosecution. Rossi, however, after speaking variously to the police, had now given one of the two key descriptions of the blow with the bat. In the circumstances, it was not a display of partisanship or bias for the court to elicit from the witness which version he finally stood by. *Commonwealth* v. *Festa,* 369 Mass. 419, 422-423 (1976), is in point. Cf. *Commonwealth* v. *Fiore,* 364 Mass. 819, 826-827 (1974). Contrast *Webb* v. *Texas,* 409 U.S. 95, 96-97 (1972).

(e) The somewhat toxic words "mug shots" were uttered by Inspector Henry Meoli when he was asked to describe in a general way "what these ten photographs [which had been shown as an array to Moscone and Madden] were pictures of." Meoli said, "[T]hey were ten mug shots, similar to the subject that we had in mind." Counsel sought a mistrial (pressing at sidebar the point that the defendant had not taken the stand for the very reason that two minor convictions might be used against him); if a mistrial was denied, counsel would prefer to have no cautionary instruction. The prosecutor suggested that he could go on to lead the witness safely away from the subject; after all, the evidence had not yet linked the defendant to the photographs. That connection, however, was suggested in the prosecutor's further examination of Meoli: Meoli testified that, just after the two youths viewed the photographs, he went to see the defendant at his home and gave him his rights. At this

point the judge consulted with the lawyers, and — although the defense expressed a preference that the matter be dealt with in the final instructions, if there was to be no mistrial — the judge instructed the jury on the spot that all testimony referring to the photographs was struck; the police, he said, have all kinds of photographs; they should put these pictures out of their minds altogether. The defense commented that the charge was fair, as far as it went.

Under *Commonwealth* v. *Blaney,* 387 Mass. 628, 638 (1982), the prosecutor should have steered clear of the subject, especially as there was no issue of identification turning on the photographs. The situation, however, did not demand a mistrial. We see no special virtue in the judge's postponing his "sanitizing" instruction to his final charge, as the defense requested; a prompt charge was perhaps better for the purpose. See *Commonwealth* v. *Simmonds,* 386 Mass. 234, 240 (1982); *Commonwealth* v. *Cunneen,* 389 Mass. 216, 224 (1983). In relation to the relevant testimony, which left uncertain why the defendant's picture found its way into a police file, and in the context of the case as a whole, the judge's instruction seems to us to have held good promise of removing most of the sting of the blunder, if not all. We do not think the contretemps "could have appreciably influenced the jury or tainted their verdict." *Commonwealth* v. *Simmonds,* 386 Mass. at 241, quoting from *Commonwealth* v. *Vanetzian,* 350 Mass. 491, 495 (1966).

3. *Prosecutor's closing.* In his closing statement to the jury, the prosecutor argued at some length that a person could not claim that he struck in self-defense if he struck the first blow; and it was the defendant who did so. Defense counsel did not object at the time, but, after the judge had completed his charge to the jury on self-defense among other things, he requested a charge that the jury should disregard the prosecutor's remarks on the subject. This the judge declined to do for fear that it would give the matter undue stress or prominence.

One who strikes the first blow does not necessarily forfeit all claim to self-defense (and to charge the contrary would tend to foist the burden of proof on that person as defendant,

see *Commonwealth* v. *Harrington,* 379 Mass. 446, 454 ([1980]), but it is still generally true that the initiator of an affray is not in a position to claim the benefit of the defense. See *Commonwealth* v. *Bellamy,* 391 Mass. 511, 515 (1984). The prosecutor's statements were thus misleading in a strict sense but not entirely off the mark. The substance of the judge's charge was correct: that the defendant could justify a first blow if he was confronted by deadly force in the form of the victim's use of a tire iron. See *Commonwealth* v. *Maguire,* 375 Mass. 768, 772 (1978); LaFave & Scott, Criminal Law § 53, at 394-395 (1972). The jury were told more than once that the judge's charge prevailed over anything counsel may have said. Evaluating the content and degree of persistency of the prosecutor's argument in the light of the facts and finally in relation to the judge's instructions, see *Commonwealth* v. *Borodine,* 371 Mass. 1, 9 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Earltop,* 372 Mass. 199, 203-204 (1977), we conclude that there was no material error.

4. *Failure to instruct on involuntary manslaughter.* At the close of the Commonwealth's case the judge entertained and denied motions for required findings of not guilty of first and second degree murder, voluntary manslaughter, and assault and battery; and he went on to instruct on each. There was agreement at the time that the evidence failed to support involuntary manslaughter, but it is argued on appeal that justice was not done because the jury were denied the possibility of such a verdict. We think it clear that the evidence did not in reason allow a finding that the defendant, if he swung the bat at all, did so wildly or recklessly rather than intentionally. See *Commonwealth* v. *LeBlanc,* 373 Mass. 478, 491-492 (1977). For the customary definition of involuntary manslaughter in distinction from the voluntary crime, see *Commonwealth* v. *Kinney,* 361 Mass. 709, 712 (1972); *Commonwealth* v. *Chandler,* 17 Mass. App. Ct. 1022, 1023-1024 (1984).

5. *Proof of murder in second degree.* Error is claimed in the denial of the motion for a required finding of not guilty of murder in the second degree. There was enough to support the verdict as matter of law: malice could be inferred from the inten-

tional use of a deadly weapon, a bat, see *Commonwealth* v. *Whipple,* 377 Mass. 709, 715 (1979); *Commonwealth* v. *Repoza,* 382 Mass. 119, 132-135 (1980), and the intention to inflict a fatal injury, from the overhead swing with that weapon, following upon the defendant's declared purpose to kill if the Malden men did not leave. Cf. *Repoza, supra* at 132. Nor was the defendant's intoxication so extreme as to prevent his forming the deadly intent. See *Commonwealth* v. *Soaris,* 275 Mass. 291, 299-300 (1931); *Commonwealth* v. *Whipple,* 377 Mass. at 714; Nolan, Criminal Law § 645, at 468 (1976). The brawl was a "senseless" one where decision was difficult as between murder and manslaughter, but it belonged to the jury under proper instructions. Compare *Commonwealth* v. *Whipple, supra* at 715, with *Commonwealth* v. *Ransom,* 358 Mass. 580, 583 (1971); *Commonwealth* v. *Gaulden,* 383 Mass. 543, 557-558 (1981), and *Commonwealth* v. *Keough,* 385 Mass. 314, 321 (1982).

By motion pursuant to Mass.R.Crim.P. 25(b) (2), 378 Mass. 896 (1979), the defense besought the judge, after the guilty verdict came in, to reduce the conviction to voluntary manslaughter. Denial of the motion was not error, viewed either as a reconsideration of the denial of a required finding, or as a refusal of the favorable exercise of discretion.

6. *"Overcharging."* Finally we consider the contention that the Commonwealth acted in bad faith when it procured an indictment for first degree murder but in reality prosecuted for murder in the second degree — a stratagem that had the effect, so says the defense, of depriving the defendant of the choice of claiming a trial without a jury,[12] and, more important, of leading the jury, which otherwise might have found manslaughter, to bring in the second degree verdict as a "compromise" between first degree murder and manslaughter.

Arguendo we shall accept the premise that a defendant might have a serious grievance if the predicated bad faith were

---

[12] There is, however, no indication of record that the defendant wanted that mode of trial.

shown;[13] and we examine the argument even though nothing of this sort was put to the trial judge. It makes strongly against the defense that it did not attack the indictment on the ground that insufficient cause for a first degree charge had been presented to the grand jury; in fact the defense claimed a bill of particulars and the Commonwealth supplied it. Further, when motions for required findings were made at the close of the evidence, the judge after consideration allowed the charge of first degree murder to stand. He took the view that, as the evidence had developed at trial, the jury could reasonably infer that the defendant had a locus poenitentiae whether to wield the bat with killing force and could disbelieve the notion that the defendant saw himself threatened by a tire iron. And, as mentioned above, there was sufficient proof to go to the jury on the second degree charge, on which the jury in fact convicted.

It is true that the prosecutor said in a lobby conference at the close of the evidence that he would be surprised if the jury came back with a verdict of first degree murder. However the judge in his final instructions directed the jury to consider this charge. The prosecutor invited the jury to do the same, although he was frank to suggest that the proper verdict on the evidence as it unfolded at trial was murder in the second degree. Whether or not the suggestion was actuated by compassion, it does not indicate that the first degree charge was a bad faith contrivance.

*Judgments affirmed.*

---

[13] The large subject of developing methods of control or guidance of the practical power of prosecutors to initiate criminal charges is broached in Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521 (1981). Our standard, S.J.C. Rule 3:08, PF 6, as appearing in 382 Mass. 800 (1981), says simply: *"Discretion in the Charging Decision.* It is unprofessional conduct for a prosecutor to institute or cause to be instituted criminal charges when he knows that the charges are not supported by probable cause." For a recent case on the question of "undercharging," see *State ex rel. Hamstead* v. *Dostert,*     W.Va.     (1984) (313 S.E. 2d 409 [W. Va. 1984] ), with an opinion concurring and dissenting by Neely, J.