NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10476

COMMONWEALTH  vs.  YAT FUNG NG.


Suffolk.     October 13, 2022. - February 8, 2023.

Present:  Budd, C.J., Gaziano, Cypher, Kafker, & Wendlandt, JJ.


Homicide.  Constitutional Law, Fair trial, Public trial,
    Assistance of counsel, Sentence.  Due Process of Law, Fair
    trial, Presence of defendant in courtroom, Sentence.  Fair
    Trial.  Evidence, Hearsay, Relevancy and materiality, Self-
    defense, State of mind, Spontaneous utterance.  Self-
    Defense.  Practice, Criminal, Capital case, Fair trial,
    Presence of defendant, Public trial, Hearsay, Assistance of
    counsel, Sentence.


    Indictments found and returned in the Superior Court
Department on August 20, 2004.

    The cases were tried before Charles T. Spurlock, J.; and a
motion for a new trial, filed on October 29, 2014, was heard by
Maynard M. Kirpalani, J.


    James L. Sultan for the defendant.
    Ian MacLean, Assistant District Attorney (Lynn S.
Feigenbaum, Assistant District Attorney, also present) for the
Commonwealth.


    CYPHER, J.  The defendant, Yat Fung Ng, was convicted of

murder in the first degree on a theory of deliberate

premeditation after he shot and killed the victim, Karriem Brown, outside a bar in Boston.[1] Following his conviction in 2008, the defendant was sentenced to life in prison without the possibility of parole pursuant to G. L. c. 265, § 2. The defendant filed his initial motion for a new trial in 2014, which subsequently was denied. This court consolidated the denial of that motion with the defendant's direct appeal from his convictions. Following oral argument, and review of the defendant's appeal pursuant to G. L. c. 278, § 33E (§ 33E), the case was remanded for an evidentiary hearing on an unraised claim of ineffective assistance of counsel.[2]

After the order for remand, but before an evidentiary hearing was held, the defendant filed a second motion for a new trial. Following an evidentiary hearing, the judge allowed the defendant's second motion for a new trial. The Commonwealth appealed, and this court reversed the allowance of the motion for a new trial, concluding that trial counsel in fact was not

---

[1] The defendant also was convicted of carrying a firearm without a license in violation of G. L. c. 269, § 10 (a).

[2] More specifically, this court sought an evidentiary hearing for review of trial counsel's "decision to forgo a jury instruction on voluntary manslaughter, her focus on the question of self-defense, and her decision not to object to certain of the jury instructions on the use of deadly force in self-defense."

ineffective. See Commonwealth v. Yat Fung Ng, 489 Mass. 242 (2022).

We now review the defendant's direct appeal of his underlying convictions, pursuant to § 33E, as well as his appeal from the denial of his initial motion for a new trial. The defendant raises seven issues: (1) whether the defendant's exclusion from all substantive sidebars during the course of the trial constitutes structural error warranting automatic reversal; (2) whether the trial judge abused his discretion in excluding the defendant's statement to Omar Sierra shortly after the shooting, where the judge determined that the statement constituted inadmissible hearsay; (3) whether the trial judge abused his discretion in admitting both the defendant's military records and expert testimony on the defendant's designation as an Army sharpshooter; (4) whether the closure of the court room during jury empanelment violated the defendant's constitutional right to a public trial; (5) whether trial counsel constitutionally was ineffective for failure to advocate for a verdict of guilty of murder in the second degree; (6) whether sentencing the defendant to life imprisonment without the possibility of parole, absent an individualized sentencing hearing, constituted cruel or unusual punishment; and (7) whether this court should reduce the defendant's conviction to guilty of murder in the second degree, pursuant to the powers

afforded under § 33E.  For the reasons discussed infra, we affirm the defendant's convictions, and we conclude that there is no reason to exercise our authority under § 33E either to reduce the verdict or to grant the defendant a new trial.

Background.  We summarize the facts the jury could have found, reserving some details for later discussion.  On May 23, 2004, at approximately 2 A.M., a bar located on Beacon Street in the Fenway section of Boston was closing for the night.  As the bar closed, patrons were being ushered out by the bar's security staff.  The victim was among those patrons who were leaving, along with his two friends, Ray Lee and Standly Miranda.

As the patrons were leaving, an altercation ensued between a group of individuals and Lee and Miranda.  At first, the altercation was verbal, mere banter about Lee wearing a New York Yankees baseball cap.  However, the banter quickly turned to insults.  A woman in one group began to insult Lee on his physical appearance, to which Lee responded with insults of his own, calling her a "bitch" and a "ho."  At this point, the altercation became physical by way of pushing and punching.  The victim was not involved in the initiation of the altercation, but he joined the fight when he saw Lee and Miranda were involved.

During the fight, witnesses described the victim as "throwing bodies" around.  Someone involved in the fight tried

to hit the victim; the victim then punched a man and pushed the woman who had been trading insults with Lee to the ground.  The woman exclaimed that she was going to call police; in response, the victim grabbed the woman's purse and threw it onto the median in the middle of Beacon Street.  As the fight was nearing an end, Lee retrieved a fraternity "step cane" from the trunk of his car, which was parked nearby, and began twirling it, telling members of the other group involved in the fight, "[Y]ou don't want any of this."  Lee, however, did not use the step cane to assault anyone physically during the fight.[3]  The victim never was seen armed with a weapon of any sort before, during, or after the initial altercation.

As the initial fight had concluded, and security from the bar had dispersed the group of individuals who were fighting outside the bar, the defendant, who had witnessed the victim push the woman to the ground, "instinctively took his jacket off and ran right over to the scene."  The defendant confronted the victim, Lee, and Miranda, and began to threaten them with a gun.  More specifically, the defendant told the victim and his friends, "You think you're bullet proof, you think you're bullet

_____

[3] Lee's fraternity step cane signified his membership in an African-American fraternity.  The step cane was shorter than a typical walking cane, only the length from the ground to Lee's knee, as it was designed to be twirled and used for tricks during the fraternity's step dances.

proof"; "What's up tough guys? You think you're bullet proof? I got something for you. I got something for you in my trunk. You think you're bullet proof?"[4]

At this point, Lee and Miranda grabbed the victim and tried to bring him back to Lee's nearby parked car, but the victim still was "excited" from the earlier altercation. As Lee and Miranda brought the victim to Lee's car, the defendant continued "baiting" them in a loud, antagonistic manner. As the defendant baited the victim and his friends, the defendant repeatedly punched his palm.

Lee and Miranda finally were successful in getting the victim into Lee's car. Miranda returned to his own car to drive home. Lee tried to follow behind Miranda's car, but as Miranda drove away, Lee was forced to stop for a group of people who were walking in front of Lee's car at the intersection of Beacon and Miner Streets, near the bar.

While the car was stopped, the victim opened the passenger's side door and exited; he threw his jacket on the ground, ripped his shirt open, and began walking toward the front of the bar. The victim was yelling angrily at the defendant, asking why the defendant was threatening him. As the victim was yelling, the defendant walked to his own car, parked

---

[4] At trial, Lee testified that what the defendant was referring to in the trunk of his car was a firearm.

in front of the bar, to which the victim responded, "You better run."  On hearing this, the defendant picked up his pace toward his car, walking purposefully.  When a nearby witness told the defendant something to the effect of "It's over," the defendant responded with either "It's not over for me" or "I have business."

When the defendant arrived at his car, he initially searched through the driver's side door but then made his way to the trunk and emerged with a gun.[5]  The defendant turned to the defendant, raised the gun, and pointed it at the victim, saying, "Yeah, you want this?  You want this?"  The victim responded, "What are you gonna do, shoot me?  Go ahead, shoot me," as well as "Go ahead, do it.  Do it."  At this point, the defendant and the victim were at least from ten to twenty feet away from each other, and they had stopped advancing toward each other.[6]

On hearing the victim's statements goading the defendant to shoot him, the defendant fired at the victim, hitting him in the

---

[5] The gun was similar in nature to a handgun.

[6] The description of the movements leading up to the shooting differed from witness to witness.  Specifically, there were differences regarding the distance between the defendant and victim at the time the defendant fired the fatal shot; whether the victim had continued to advance toward the defendant; and whether the victim had been retreating.  We summarize the facts in the light most favorable to the Commonwealth, however, thus resolving these factual inconsistences in the prosecution's favor.  See Commonwealth v. Duke, 489 Mass. 649, 651 (2022).

forehead.[7]  The victim immediately fell backward onto the pavement.[8]  The defendant then got into his car and fled the scene.  Seeing that the victim had been shot, Lee got into his car as well and sped after the defendant.  Lee was unable to keep pace with the defendant but did manage to take note of the defendant's vehicle information, including his vehicle's registration number.

The defendant's vehicle information was broadcast to Boston police; he was stopped by police in nearby Chelsea, was brought back to the scene of the crime, and was arrested after being identified by witnesses as the shooter.

Discussion.  1.  Exclusion from sidebar conferences.  At trial, the defendant was excluded from all substantive sidebar conferences, despite his attorney's requests that he be present and subsequent objections on multiple occasions to the judge's decision to exclude him.  The defendant argues that his absence from all substantive sidebars at trial violated his constitutional and procedural right to be present at all

---

[7] The evidence at trial was unclear as to how many shots the defendant fired, ranging from at least one to no more than three.

[8] The gunshot wound ultimately proved to be fatal; the victim was taken off life support nearly thirty days after the shooting occurred.

critical stages of the proceedings, thus constituting a structural error warranting reversal.

"Rule 18 (a) [of the Massachusetts Rules of Criminal Procedure, 378 Mass. 887 (1979),] provides that criminal defendants have the right to be present at all critical stages of a court proceeding." Vazquez Diaz v. Commonwealth, 487 Mass. 336, 343 (2021). "[A] defendant's right 'to be personally present at every step of the proceedings against him . . . is of ancient origin.'" Id., quoting Commonwealth v. Bergstrom, 402 Mass. 534, 543 (1988). The rule is derived from the confrontation and due process clauses of the Sixth and Fourteenth Amendments to the United States Constitution, respectively, and art. 12 of the Massachusetts Declaration of Rights. Vazquez Diaz, supra at 344.

The defendant argues that his right to be present at all critical stages of the proceedings was violated because he was excluded by the judge from being present at all substantive sidebar conferences during the trial. In his brief, however, the defendant more narrowly focuses only on the sidebar conferences concerning the state of the evidence of his subjective state of mind as it relates to self-defense. Those sidebar conferences include the initial argument on the fourth day of trial as to whether the testimony of a potential key witness, Omar Sierra, constituted inadmissible hearsay; the

argument for and against admissibility of Sierra's testimony following the voir dire of Sierra; reconsideration of the issue later that same day; and the defendant's choice not to call Sierra as a witness following the judge's exclusion of certain potentially exculpatory hearsay testimony from Sierra.[9]  Perhaps most importantly though, the defendant takes issue with his exclusion from a sidebar conference on the seventh day of trial, in which the judge remarked that there was "no evidence of any subjective fear on [the defendant's] part."

Whether a sidebar is a critical stage requires particularized consideration.  A defendant's right to be present at sidebar is not absolute, as a judge "may perform minor administrative formalities" at a sidebar conference outside a defendant's presence without violating the defendant's right to be present at all critical stages of the proceedings.  See Commonwealth v. Angiulo, 415 Mass. 502, 530 (1993).  There also is no absolute right even where the defendant complains of exclusion from "substantive sidebars," rather than those that involve merely administrative matters.  See Commonwealth v. Francis, 485 Mass. 86, 98-99 (2020), cert. denied, 141 S. Ct. 2762 (2021), quoting Robinson v. Commonwealth, 445 Mass. 280, 285 (2005) ("Although rule 18 does not identify what stages of

---

[9] The voir dire of Sierra was also conducted outside the defendant's presence.

court proceedings are 'critical,' 'fairness demands that the defendant be present when his [or her] substantial rights are at stake'" [emphasis added]).

The defendant's right to be present at a sidebar conference turns not on the substantive versus procedural dichotomy, nor does it turn on whether a substantive sidebar deals with an issue of law as opposed to one of fact;[10] while those certainly may be considered, the defendant's right to be present at sidebar ultimately depends on whether his or her presence "would contribute to the fairness of the procedure," Kentucky v. Stincer, 482 U.S. 730, 745 (1987), particularly where the sidebar involves an issue of significance at trial and the exercise of the rights reserved only to the defendant, like here, where the sidebar conferences necessarily implicated the defendant's decision on whether to testify.  However, where a defendant's "presence would be useless, or the benefit but a shadow," id., quoting Snyder v. Massachusetts, 291 U.S. 97, 106-107 (1934), we see no reason for the defendant to be present at

---

[10] A number of Federal courts have concluded that a defendant may be excluded from all purely legal discussions at sidebar, while recognizing that sidebars presenting a mixture of facts and law may raise a different set of considerations.  See Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000).  See also United States v. Taylor, 489 Fed. Appx. 34, 45 (6th Cir.), cert. denied, 568 U.S. 1017 (2012); United States v. McCoy, 8 F.3d 495, 497 (7th Cir. 1993); Robinson v. Graham, 671 F. Supp. 2d 338, 358 n.77 (N.D.N.Y. 2009).  We decline to adopt such a pure fact versus law dichotomy.

sidebar, even where the sidebar involves a substantive issue in the case.  See Snyder, supra.

Where the defendant's presence at sidebar would not be but a shadow, but instead would serve some consequential purpose as it relates to the issues of significance at trial, the defendant's presence at sidebar ought to be permitted.  See Commonwealth v. Colon, 482 Mass. 162, 172 (2019), quoting Commonwealth v. Dyer, 460 Mass. 728, 738 (2011) ("When a judge conducts an inquiry about a consequential matter, such as an allegation of serious misconduct of a juror or a suggestion of juror bias, the defendant is entitled, based on confrontation and fair trial rights, to be present").  See also Commonwealth v. Sleeper, 435 Mass. 581, 588-589 (2002) (defendant entitled to be present for consequential matter of questioning impartiality of juror).  In such circumstances, "'[c]ounsel's presence at sidebar and intention to relay information to a defendant does not substitute for the defendant's presence' during a critical stage of the proceedings."  Francis, 485 Mass. at 99, quoting Colon, supra at 172-173.

Allowing the defendant to be present in such circumstances "provides the accused with information necessary to adjust [his or her] trial strategy, guarantees that a defendant always has the opportunity to object, and, in the event of conviction, ensures that the defendant is able fully to assist in an

appeal." Colon, 482 Mass. at 174. This court trusts that judges, the defense bar, and prosecutors throughout the Commonwealth will encourage defendants to be present as often as needed and should do so based on their collective experience and trial judges' inherent discretion over their court rooms.[11]

Here, the defendant was excluded from the substantive sidebars that concerned the evidence, or lack thereof, of his subjective state of mind as it relates to self-defense. He averred in his affidavit in support of his motion for a new trial that he would have insisted on testifying had he heard that the trial judge characterized the evidence of his subjective state of mind as being scant. Where the defendant possessed a unique perspective on the evidence of his subjective state of mind in the moments leading up to the shooting, the defendant ought to have been present at the sidebar conference. See Commonwealth v. Campbell, 83 Mass. App. Ct. 368, 373-374 (2013) (defendant "has the ability to consult with his attorney and, as a participant in the event under examination, offer a unique perspective").

---

[11] In addition to such experience, the necessary balance of authority between counsel's obligation to determine proper trial management strategy, and the defendant's exclusive authority to make certain fundamental decisions regarding his or her own defense, see Commonwealth v. Miranda, 484 Mass. 799, 818-819, cert. denied, 141 S. Ct. 683 (2020), also may serve as a guiding principle to the defendant's right to be present at sidebar.

While we acknowledge that it would have been better practice for the defendant to have been present for these particular sidebar conferences, we note the importance of the defendant's specific requests to be present at sidebar. Without such a specific request to be present, the defendant's right to be present at sidebar will be deemed waived. See Commonwealth v. Fritz, 472 Mass. 341, 347 (2015). See also Dyer, 460 Mass. at 738. A defendant also may forfeit the right to be present through misconduct.[12] See Snyder, 291 U.S. at 106, citing Diaz v. United States, 223 U.S. 442, 455 (1912) ("No doubt the privilege [to be present at all critical stages] may be lost by consent or at times even by misconduct"). See also Commonwealth v. Senati, 3 Mass. App. Ct. 304, 307 (1975) (defendant forfeited right to be present at trial by refusing repeatedly to obey judge's orders, demonstrating unrelenting determination not to comply with court room decorum).

Because we hold that the defendant ought to have been present at the sidebar, we must next assess whether the error

---

[12] If a judge finds that a defendant is being unruly, disruptive, or otherwise acting inappropriately during sidebar conferences, or where there exist security concerns to prevent the defendant from being present at sidebar, the judge may properly exercise his or her discretion to exclude the defendant from sidebar. See Commonwealth v. Perez, 390 Mass. 308, 316 (1983), S.C., 442 Mass. 1019 (2004), citing Commonwealth v. Haley, 363 Mass. 513, 518-519 (1973) ("A trial judge is responsible for controlling the trial, maintaining order in the courtroom, and guarding against improper conduct of counsel").

warrants reversal.  The defendant argues that his exclusion from sidebar conferences resulted in structural error, requiring reversal without a showing of actual harm.  We disagree. "[T]here is a very limited class of cases presenting structural errors that require automatic reversal absent waiver.  Such errors include the denial of counsel or the right to public trial, the omission of an instruction on the standard of beyond a reasonable doubt, racial discrimination in the selection of a jury, or trial before a biased judge" (quotation and citations omitted).  Francis, 485 Mass. at 99-100.  Each of these structural errors "contain[s] a 'defect affecting the framework within which the trial proceeds.'"  Francis, supra at 100, quoting Neder v. United States, 527 U.S. 1, 8 (1999).

Here, the defendant's exclusion from the sidebar conferences in which the topic of his subjective state of mind was discussed does not affect the framework within which the defendant's trial proceeded, and thus does not constitute structural error; instead, the error is a constitutional trial error that we can quantitatively assess in the context of other evidence.  See Sleeper, 435 Mass. at 588-589 (defendant's exclusion from colloquy between judge and juror, in which impartiality of trial juror was questioned, violated defendant's constitutional right to be present but did not rise to level of structural error).  Such quantitative assessment involves the

application of a harmless error standard to determine whether the exclusion warrants reversal. See id. at 589; Commonwealth v. Owens, 414 Mass. 595, 603 (1993). Under this standard, if "[t]he defendant's presence . . . would not likely have yielded anything or altered [the] outcome," then exclusion of the defendant from a critical stage will be deemed harmless beyond a reasonable doubt.[13] See Sleeper, supra.

Here, any such evidence and discussion at the sidebar conferences in which the defendant's subjective state of mind was discussed only bore on the issue of self-defense, which this court already has held was unavailable to the defendant in these circumstances, given the defendant's failure to use the reasonable means of retreat that were available to him prior to shooting the victim. See Yat Fung Ng, 489 Mass. at 253.

---

[13] We only review preserved constitutional errors under the harmless error standard, see Commonwealth v. Yasin, 483 Mass. 343, 350 (2019), citing Commonwealth v. Tyree, 455 Mass. 676, 700-701 (2010), "unless the constitutional right infringed is 'so basic to a fair trial that [its] infraction can never be treated as harmless error'" (citation omitted), Commonwealth v. Vinnie, 428 Mass. 161, 163-164 (1998). In the later circumstance, as explained supra, we consider the deprivation of the defendant's constitutional right to be structural error. See Francis, 485 Mass. at 99-100. Generally, the harmless error standard is more favorable to the defendant than the standards applicable to certain other nonconstitutional errors. See Vinnie, supra. Under this more favorable standard, we presume prejudice when faced with a constitutional violation, and such prejudice can be overcome only where the Commonwealth makes an affirmative showing that the error is harmless beyond a reasonable doubt. See Tyree, supra at 701.

Therefore, where the erroneous exclusion of the defendant from these particular sidebar conferences would not have altered the outcome, this trial error was harmless beyond a reasonable doubt and does not warrant reversal.[14]

2. <u>Sierra's testimony</u>. At trial, the defendant's primary defense was one of self-defense. The defendant anticipated that his statement to the Commonwealth's witness, Sierra, approximately twenty minutes after the shooting, would aid that defense. The defendant planned to have Sierra testify on cross-examination that the defendant told Sierra, soon after the shooting, something akin to, "[H]e was coming at me, he was coming at me, so I had to shoot him." At trial, however, the Commonwealth chose not to call Sierra as its witness, and simultaneously sought to exclude the very statement the defendant sought to introduce. The trial judge ruled in favor of the Commonwealth and excluded the statement as inadmissible hearsay. Defense counsel objected and then did not call Sierra as a defense witness.

---

[14] In summary fashion in his brief, the defendant also takes issue with his exclusion from the substantive sidebars relating to other evidentiary issues, including, but not limited to, those that addressed the admissibility of Sierra's testimony, the admissibility and scope of expert testimony about the defendant's military record, and the use of a step cane by the prosecutor as a demonstrative device. Where the defendant's presence at these other substantive sidebars would not have yielded anything, or altered the outcome, we discern no structural error. See <u>Sleeper</u>, 435 Mass. at 589.

On appeal, the defendant argues that the judge erred in ruling that the defendant's statement to Sierra was inadmissible hearsay.  "We review a judge's evidentiary rulings for an abuse of discretion."  Commonwealth v. Andre, 484 Mass. 403, 414 (2020), citing Commonwealth v. Rosa, 468 Mass. 231, 237 (2014).  Under such a standard, we "do not disturb a trial judge's decision absent a clear error of judgment in weighing the relevant factors."  Commonwealth v. McDonagh, 480 Mass. 131, 140 (2018), quoting Commonwealth v. Brown, 477 Mass. 805, 820 (2017).

"Hearsay is an out-of-court statement offered by a witness at trial or hearing to prove the truth of the matter asserted."  Commonwealth v. Romero, 464 Mass. 648, 651 (2013).  See Mass. G. Evid. § 801(c) (2022).  Hearsay is "generally inadmissible unless it falls within an exception to the hearsay rule."  Commonwealth v. Rice, 441 Mass. 291, 305 (2004).  See Mass. G. Evid. § 802 (2022).

Here, the trial judge excluded Sierra's testimony that the defendant told him after the shooting, while still evading police, that "he was coming at me, he was coming at me, so I had to shoot him."  The trial judge determined that where the statement was being admitted for the truth of the matter asserted, it was inadmissible.  Defense counsel, however, argued that the statement was not hearsay, as it was being admitted for

the nonhearsay purpose of the defendant's state of mind.  We disagree.

Here, the probative value of the defendant's statement to Sierra rested in its ability to demonstrate that the defendant acted in lawful self-defense.  For a defendant to have acted in lawful self-defense, the defendant must have "reasonably and actually believed that he was in 'imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force.'"  Commonwealth v. Pike, 428 Mass. 393, 396 (1998), quoting Commonwealth v. Harrington, 379 Mass. 446, 450 (1980).  In Commonwealth v. Burbank, 388 Mass. 789, 794-795 (1983), we examined an almost identical factual scenario to the circumstances here, where the defendant called his friend the day after shooting the victim and told him, among other things, "I was chased into the alleyway and I had to fire."  While we determined the statement to be hearsay in character, it was nonetheless admitted, not because it constituted admissible nonhearsay or alternatively satisfied one of the hearsay exceptions, but rather because the prosecution failed to object to its admission.[15]  See id. at 795.

An almost identical statement was made by the defendant here to Sierra.  Like the statement in Burbank, the probative

_____

[15] Here, the prosecution objected to the statement's admissibility.

value of the defendant's statement is limited by its hearsay character, see Burbank, 388 Mass. at 795, as its value to the defendant is necessarily intertwined with its truth. If the statement, "he was coming at me, he was coming at me, so I had to shoot him," were not admitted for its truth, it would not shed any light on whether the defendant reasonably and actually believed he was in imminent danger of death or serious bodily harm, as required for the defendant to have acted in lawful self-defense. See Pike, 428 Mass. at 396 (defendant must reasonably and actually believe he was in imminent danger of serious bodily harm or death to justify use of deadly force in self-defense). The statement necessarily was being offered to prove a fact, i.e., the fact that the victim was coming at the defendant causing the defendant to shoot. Cf. Commonwealth v. Jenkins, 458 Mass. 791, 793-794 (2011) (statement made to defendant, "You don't want to do this here," admissible not to prove fact that defendant did not want to shoot victim in victim's barbershop, but instead served as cumulative part of witness's statement describing verbal altercation that took place at victim's barbershop). Thus, where the statement's truth necessarily is intertwined with its probative value, we agree with the trial judge that it constituted inadmissible hearsay.

We also note the deficiencies in the defendant's argument that the statement constituted admissible nonhearsay. For the statement to be admissible as nonhearsay, the statement must be relevant on the defendant's state of mind in a manner separate and apart from its truth. See Mass. G. Evid. § 801 note ("when out-of-court statements are offered for a reason other than to prove the truth of the matter asserted or when they have independent legal significance, they are not hearsay"). In these circumstances, the statement's probative value stems from the fact that the statement was made, rather than to prove the facts asserted within. See Commonwealth v. Siny Van Tran, 460 Mass. 535, 550 (2011). Among the nonhearsay purposes for which a statement may be admissible is to provide evidence of the declarant's state of mind. See Commonwealth v. Martinez, 487 Mass. 265, 272 (2021). "For statements that convey the declarant's state of mind circumstantially or that are probative of another's state of mind," the statement is admissible for a nonhearsay purpose (emphasis added). Mass. G. Evid. § 803(3)(B) note (2022). Alternatively, "[w]here the declarant asserts his or her own state of mind (usually by words describing the state of mind), the statement is hearsay and is admissible only if it falls within the [then-existing state of mind] hearsay exception." Mass. G. Evid. § 801 note, Evidence Admitted for Nonhearsay Purpose, As Circumstantial Evidence of Declarant's

State of Mind (Mass. G. Evid. § 801 note on state of mind). "This exception applies only to statements that assert the declarant's own state of mind directly" (emphasis added). Mass. G. Evid. § 803(3)(B) note, citing Commonwealth v. Woollam, 478 Mass. 493, 499 (2017), cert. denied, 138 S. Ct. 1579 (2018).

Here, the words themselves directly described the defendant's state of mind, i.e., that the defendant believed he had to shoot the victim because the victim was coming at him. Because the words themselves directly described the defendant's state of mind, the statement is hearsay, and the proper path toward admissibility to demonstrate the defendant's state of mind would have been only through the state of mind hearsay exception. See Mass. G. Evid. § 801 note on state of mind.

In coming to this conclusion, we emphasize our standard of review and the broad discretion afforded to trial judges in making evidentiary rulings. See Commonwealth v. Martinez, 476 Mass. 186, 190 (2017). Where the judge's ruling that the statement was hearsay is not clear error in light of the relevant considerations, we can discern no abuse of discretion. See McDonagh, 480 Mass. at 140. Where we discern no abuse of discretion in the trial judge's determination that the statement necessarily was being admitted for its truth, our analysis next turns to whether the statement is nonetheless admissible under one of the hearsay exceptions. See Rice, 441 Mass. at 305. "We

grant a trial judge broad discretion in determining whether a hearsay exception applies." Commonwealth v. Ray, 467 Mass. 115, 137-138 (2014), citing Commonwealth v. King, 436 Mass. 252, 254-255 (2002).

Here, the defendant's statement does not qualify under the state of mind exception to the hearsay rule, as a statement "purporting to explain past conduct is not admissible" under this exception. Commonwealth v. Bianchi, 435 Mass. 316, 327 (2001). See Mass. G. Evid. § 803(3)(B)(ii) ("Statements, not too remote in time, which indicate an intention to engage in particular conduct, are admissible to prove that the conduct was, in fact, put in effect. Statements of memory or belief to prove the fact remembered or believed do not fall within this exception"). Therefore, where the defendant's statement sought to explain his past conduct, i.e., why he shot the defendant, it did not shed light on the defendant's present or future intent to act, and thus was not admissible under the state of mind hearsay exception. See Commonwealth v. Pope, 397 Mass. 275, 281 (1986) (suicide note confessing to killing victim not admissible to demonstrate premeditation and motive, where it purported to explain past conduct and did not disclose present or future intent to kill).

At trial, the defendant also argued that the statement was admissible under the excited utterance exception to the hearsay

rule.  See Commonwealth v. Baldwin, 476 Mass. 1041, 1042 (2017), quoting Commonwealth v. Alcantara, 471 Mass. 550, 558 (2015) ("A statement meets the test for admissibility as an excited utterance if '[1] there is an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of the observer, and [2] if the declarant's statement was a spontaneous reaction to the occurrence or event and not the result of reflective thought'" [quotations omitted]).  See also Mass. G. Evid. § 803(2) (2022).  Where the defendant's statement came nearly twenty minutes after the shooting occurred, undoubtedly after the defendant had time to reflect on the incident, we also discern no abuse of discretion in ruling that the statement does not constitute an excited utterance, as it was not "spontaneous to a degree which reasonably negate[s] premeditation or possible fabrication." Commonwealth v. Linton, 456 Mass. 534, 548 (2010), S.C., 483 Mass. 227 (2019), quoting Commonwealth v. DiMonte, 427 Mass. 233, 236 (1998).

Finally, on appeal, the defendant argues that the statement was admissible pursuant to the more narrow constitutionally based hearsay exception.  See Commonwealth v. Drayton, 473 Mass. 23, 36 (2015), S.C., 479 Mass. 479 (2018) (affidavit that failed to fall into any traditional hearsay exception would be admissible where defendant establishes that such evidence [1] is

critical to his or her defense, and [2] bears persuasive assurances of trustworthiness).  We disagree.[16]

In Drayton, "we carved out a narrow exception for the 'rarest' of cases 'where otherwise inadmissible evidence is both truly critical to the defense's case and bears persuasive guarantees of trustworthiness.'"  Commonwealth v. Deconinck, 480 Mass. 254, 267 (2018), quoting Drayton, 473 Mass. at 40.  We have applied this exception only where it is necessary "to avoid injustice 'where constitutional rights directly affecting the ascertainment of guilt are implicated,'" Commonwealth v. Steeves, 490 Mass. 270, 282 (2022), quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973), or where "exclusion of evidence 'significantly undermine[s] fundamental elements of [a] defendant's defense,'" Steeves, supra, quoting United States v. Scheffer, 523 U.S. 303, 315 (1998).  Neither of those two circumstances is present here.  Where we have held that this

---

[16] The Commonwealth argues that trial counsel specifically did not raise the constitutionally based hearsay exception as the ground for the admission of Sierra's testimony.  The Commonwealth contends, therefore, that the proper standard under which we review the denial of the admission of Sierra's testimony is under § 33E, namely, whether the denial caused a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Upton, 484 Mass. 155, 159-160 (2020).  See also Commonwealth v. Flynn, 362 Mass. 455, 472 (1972) (defendant "is not permitted to raise an issue before the trial court on a specific ground, and then to present that issue to this court on a different ground").  Where neither standard provides the defendant relief, we discern no reversible error.

constitutionally based hearsay exception is extremely narrow, we also emphasize that the exception is not, and never was intended to be, a catch-all exception to the hearsay rule. See Drayton, supra at 32-33. See also Deconinck, supra at 260-261.

Even if we were to assume that the defendant's statement was the type of statement to come within the purview of this extremely narrow, constitutionally based hearsay exception, we are skeptical of whether the defendant's statement to Sierra was truly critical to the defendant's case, as the defendant at all times retained the absolute right to testify in his own defense that the victim was coming at him during the altercation, causing the defendant to shoot. See Commonwealth v. Smith, 456 Mass. 476, 480 (2010), quoting Commonwealth v. Novo, 442 Mass. 262, 268 (2004) ("[T]he right to testify on one's own behalf in a criminal case is fundamental"). That the defendant may have needed to testify to demonstrate his own subjective state of mind during the shooting, as it relates to self-defense, would have violated neither his right against self-incrimination nor his right to present a complete defense. See Commonwealth v. Toon, 55 Mass. App. Ct. 642, 651 n.12 (2002) ("That a defendant may need to testify or present evidence in order to raise self-defense does not violate State or Federal constitutional privileges against self-incrimination"). See also Commonwealth v. Dame, 473 Mass. 524, 533 n.16, cert. denied, 580 U.S. 857

(2016) (same).  Cf. Commonwealth v. Chukwuezi, 475 Mass. 597, 602-603 (2016) (right to present complete defense "is not unfettered; it is subject to the limitations set forth under standard rules of evidence").

We acknowledge that, because the defendant was excluded from all substantive sidebars at trial, see part 1, supra, the defendant claims he did not appreciate fully his need to testify on his statements to Sierra following the shooting, as well as his subjective state of mind.  With that in mind, even if we were to further assume that the defendant's statement to Sierra was in fact truly critical to his defense, the statement does not bear the requisite persuasive guarantees of trustworthiness to render it admissible.  See Drayton, 473 Mass. at 40. "[C]ertain elements support the conclusion that a hearsay statement has 'persuasive guarantees of trustworthiness': hearsay that fails to satisfy the technical requirements for a traditional hearsay exception, but nevertheless appears to fall within the rationale for such an exception; hearsay that is corroborated by some other evidence in the case; and hearsay offering a consistent account on multiple occasions over time." Steeves, 490 Mass. at 282-283, citing Drayton, supra at 37-38. The defendant's statement to Sierra that he had to shoot the victim was not corroborated by any other evidence in the case,

nor was the statement offered on multiple occasions over time as a consistent account of the events of the shooting.

Furthermore, as discussed supra, the statement does not satisfy the requirements for the state of mind hearsay exception because it purports to explain past conduct. See Pope, 397 Mass. at 281. It also fails to satisfy the rationale of an excited utterance because it was not "spontaneous to a degree which reasonably negate[s] premeditation or possible fabrication." See Linton, 456 Mass. at 548, quoting DiMonte, 427 Mass. at 236. Therefore, where the statement also does not fall within the rationale of any hearsay exception, this only further demonstrates that the statement fails to possess the requisite persuasive guarantees of trustworthiness to have been admitted under the extremely narrow constitutionally based hearsay exception found in Drayton. See Steeves, 490 Mass. at 282-283.

At bottom, where the judge did not his abuse discretion in ruling that the statement was inadmissible hearsay, which failed to satisfy one of the many exceptions to the hearsay rule, we discern neither error nor prejudice.[17]

_____

[17] Even if we were to assume that the judge abused his discretion in ruling that the statement was inadmissible hearsay, where the defendant preserved his evidentiary objection, we review such error for prejudice. See Commonwealth v. Carney, 472 Mass. 252, 255 (2015). In doing so, we consider "whether there is a reasonable possibility that the error," if

3. Expert testimony on defendant's military record. The defendant argues that the judge abused his discretion in the admission of expert testimony on marksmanship tests the defendant previously had passed in order to achieve his military designation as a United States Army "sharpshooter" with a nine millimeter handgun. We disagree.

All evidence must meet a threshold test of relevancy such that it has a "rational tendency to prove an issue in the case" (citation omitted). Commonwealth v. Carey, 463 Mass. 378, 387 (2012). Even relevant evidence may be inadmissible, however, where its probative value substantially is outweighed by the danger of unfair prejudice. Id. at 387-388. See Mass. G. Evid. § 403 (2022). "[T]rial judges must take care to avoid exposing the jury unnecessarily to inflammatory material that might

---

any, "might have contributed to the jury's verdict" (citation omitted. Commonwealth v. Carriere, 470 Mass. 1, 7 (2014). "Reversal is not necessary if the error 'did not influence the jury, or had but very slight effect.'" Id. at 8, quoting Commonwealth v. Cruz, 445 Mass. 589, 591 (2005). Here, the defendant's statement to Sierra would have been probative of the defendant's theory of self-defense, a theory that we previously concluded ultimately was not viable given the defendant's failure to retreat prior to shooting the victim. See Yat Fung Ng, 489 Mass. at 253-254 (concluding that self-defense jury instruction was not warranted in this case); id. at 253, quoting Commonwealth v. Benoit, 452 Mass. 212, 226-227 (2008) (to act in self-defense, one must "avail[] himself [or herself] of all means, proper and reasonable in the circumstances, of retreating from the conflict before resorting to the use of deadly force"). Therefore, the defendant suffered no prejudice even if the statement was improperly excluded as inadmissible hearsay.

inflame the jurors' emotions and possibly deprive the defendant of an impartial jury."  Commonwealth v. Berry, 420 Mass. 95, 109 (1995).

"We review a judge's decision whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice under the abuse of discretion standard."  Commonwealth v. Bishop, 461 Mass. 586, 596 (2012), citing Commonwealth v. Pytou Heang, 458 Mass. 827, 851-852 (2011).  Under this standard we "do not disturb a trial judge's decision absent a clear error of judgment in weighing the relevant factors."  McDonagh, 480 Mass. at 140, quoting Brown, 477 Mass. at 820.

The Commonwealth proceeded on a theory of murder in the first degree by means of deliberate premeditation.  "To prove deliberate premeditation, the Commonwealth has to show that the defendant reflected upon his resolution to kill."  Commonwealth v. Robertson, 408 Mass. 747, 756-757 (1990), quoting Commonwealth v. Dalton, 385 Mass. 190, 196 (1982).  "Deliberate premeditation would have been present even if the killing followed reflection by only a few seconds."  Robertson, supra at 757, quoting Commonwealth v. Basch, 386 Mass. 620, 622 (1982).

After threatening the victim and his friends following their physical altercation with other patrons near the front of the bar, the defendant returned to his car, searched through the trunk, retrieved a firearm, turned back toward the victim, aimed

the firearm at the victim as the victim goaded the defendant to shoot him, and shot the victim with a single fatal shot to the forehead.  That single fatal shot struck the victim approximately one and one-half inches to the left of the middle of his forehead.  At trial, the Commonwealth used the expert testimony of Edward Conley, a former United States Army staff sergeant, to testify about the defendant's Army records, particularly about the fact that the records showed that the defendant had attained a marksmanship qualification of "sharpshooter" with a nine millimeter handgun while serving in the Army.

Conley explained the specifics of the test that a soldier must complete in order to receive such designation.  He stated that each soldier is faced with thirty targets during the test, each of which he or she has only three seconds to engage successfully.  A soldier must shoot successfully at least sixteen of thirty targets to receive a marksmanship badge, at least twenty-one of thirty targets to receive a sharpshooter badge, and then at least twenty-six of thirty targets to obtain the highest level of qualification, an expert qualification.  Thus, where the defendant's Army records demonstrated that he had received a marksmanship badge of "sharpshooter," the expert opined that he necessarily must have been able to shoot

successfully between twenty-one and twenty-five of the thirty targets presented during the test.

The defendant argues that the expert testimony of his skills and proficiency with a firearm implied to the jury that the defendant was a "trained killer."  However, "we have not unconditionally disapproved of the admission of weapons-related evidence unconnected to the commission of a crime." Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012).  Here, information about the defendant's qualification as a sharpshooter with a handgun was highly probative on the Commonwealth's theory of deliberate premeditation, as the defendant's qualification demonstrated his familiarity and specialized proficiency with a firearm.  See Commonwealth v. Tassinari, 466 Mass. 340, 352-353 (2013).  See also Commonwealth v. Hodge (No. 2), 380 Mass. 858, 863 (1980) (defendant's proficiency with firearms relevant to deliberate shooting of victim).  Where the victim was hit with a single fatal shot that landed approximately one and one-half inches to the left of the middle of the victim's forehead, the placement of the fatal wound also supports a finding of deliberate premeditation.  See Commonwealth v. Coleman, 434 Mass. 165, 169 (2001).  See also Robertson, 408 Mass. at 757.  More specifically, the placement of the victim's wound is highly probative of the defendant's

intent and "reflect[ion] upon his resolution to kill." See id. at 756-757, quoting Dalton, 385 Mass. at 196.

The defendant characterizes his military qualifications as prejudicial because they paint him in a derogatory light as a trained killer. However, contrary to the defendant's argument, his qualification as a sharpshooter was not the only subject about which Conley testified. Conley also testified that the records demonstrated that the defendant had been discharged honorably from the military and had received a number of other medals, awards, and designations.[18] Moreover, and perhaps more importantly, the judge recognized the potential for unfair prejudice in the admission of the military records. He specifically told the prosecutor that Conley would be permitted to testify only about the requirements to be qualified as a sharpshooter, as the prosecution was not going to be allowed to "make [the defendant] out [to be] a sniper or anything like that." Where the judge recognized the potential for unfair prejudice from these records and limited the prosecutor as to the scope of the expert's testimony, we discern no clear error of judgment in the judge's weighing of the relevant factors and, thus, no abuse of discretion. See McDonagh, 480 Mass. at 140.

---

[18] Those included an Army lapel button; an Army achievement medal, second award; a national defense service medal; and an Army service medal.

4. <u>Court room closure</u>. The defendant argues that the closure of the court room during jury selection on the first day of trial violated his right to a public trial under the Sixth and Fourteenth Amendments. We disagree.

"The Sixth and Fourteenth Amendments . . . guarantee defendants 'the right to a . . . public trial.'" <u>Commonwealth</u> v. <u>Garcia</u>, 482 Mass. 408, 414 (2019). "The Sixth Amendment right to a public trial extends to the jury selection process, and a violation of that right constitutes structural error." <u>Commonwealth</u> v. <u>Robinson</u>, 480 Mass. 146, 149 (2018), citing <u>Weaver</u> v. <u>Massachusetts</u>, 137 S. Ct. 1899, 1910 (2017). Where a defendant timely raises and preserves such a claim of structural error, we presume prejudice, such that reversal is automatic. <u>Robinson</u>, <u>supra</u> at 150, citing <u>Commonwealth</u> v. <u>Jackson</u>, 471 Mass. 262, 268 (2015), cert. denied, 577 U.S. 1145 (2016). However, "[n]otwithstanding the importance of the right to a public trial, it, 'like other structural rights, can be waived.'" <u>Robinson</u>, <u>supra</u>, quoting <u>Commonwealth</u> v. <u>Cohen (No. 1)</u>, 456 Mass. 94, 105-106 (2010). "Where counsel fails to lodge a timely objection to the closure of the court room, the defendant's claim of error is deemed to be procedurally waived." <u>Robinson</u>, <u>supra</u>, quoting <u>Commonwealth</u> v. <u>LaChance</u>, 469 Mass. 854, 857 (2014). This is true regardless of whether the

defendant's failure to object was a tactical decision or inadvertent. Robinson, supra.

After an evidentiary hearing on the defendant's first motion for a new trial, the motion judge found that the defendant's mother and cousin were told by court personnel that they were not allowed in the court room on the first day of trial while the jury was being empanelled. They remained outside the court room until the jury selection proceedings on the first day of trial had concluded. Both, however, were permitted to enter the court room for the remainder of the trial. Where the right to a public trial extends to the jury selection process, the defendant's Sixth Amendment right to a public trial was violated. See Robinson, 480 Mass. at 149. Whether such violation constitutes a structural error warranting automatic reversal hinges on whether the defendant lodged a timely objection to the court room closure. See LaChance, 469 Mass. at 857.

Here, the issue of the court room closure did not come to light until 2014, when the defendant's mother mentioned it in conversation with the defendant's sister. As such, neither the defendant nor trial counsel was aware at trial that the defendant's mother and cousin had been excluded from the court room during jury selection. The mere fact that trial counsel was unaware of the exclusion of the defendant's mother and

cousin from the court room during jury selection is immaterial. See Robinson, 480 Mass. at 150 (procedural waiver valid regardless of whether counsel's failure to object was tactical decision or inadvertent, including where trial counsel was unaware of court room closure). A contemporaneous objection "creates a record that can be directly reviewed by an appellate court without the need for collateral proceedings to develop the court room closure issue." Id. at 151. Without a contemporaneous objection, the trial judge is deprived of the ability to confront the violation of the defendant's constitutional rights at a time when it could be remedied. See Cohen (No. 1), 456 Mass. at 118 n.35. The defendant failed to lodge a contemporaneous objection to the court room closure; therefore, his argument procedurally is waived, and the violation does not constitute structural error warranting automatic reversal. See Robinson, supra at 154. See also Commonwealth v. Barry, 481 Mass. 388, 407, cert. denied, 140 S. Ct. 51 (2019); Commonwealth v. Fernandez, 480 Mass. 334, 347 (2018).

Nonetheless, even where the issue of court room closure is unpreserved, we review the defendant's claim to determine whether such violation created a substantial likelihood of a miscarriage of justice. See Robinson, 480 Mass. at 147. In doing so, we examine a number of factors, which include whether

"[t]he closure was limited to the jury voir dire; the courtroom remained open during the evidentiary phase of the trial; the closure decision . . . was made by court officers rather than the judge; there were many members of the venire who did not become jurors but who did observe the proceedings; and there was a record made of the proceedings that does not indicate any basis for concern, other than the closure itself."  Weaver, 137 S. Ct. at 1913.

We agree with the Commonwealth that many, if not all, of the factors listed in Weaver also were present in this case. The closure was limited only to the jury selection process, as both the defendant's mother and cousin were permitted to be in the court room during the evidentiary phase of the trial.  The closure also was done at the direction of the court officers, rather than the trial judge.  Further, there exists a transcript of the entire trial, from which we discern neither harm nor prejudice.[19]  Therefore, where the closure "did not pervade the whole trial or lead to basic unfairness," we conclude there was

---

[19] Potential harms from a court room closure include (1) the suggestion that a juror may have lied during voir dire, (2) misbehavior by the prosecutor, judge, or any other party, and (3) the suggestion that "any of the participants in the voir dire failed to approach their duties with the neutrality and serious purpose that our system demands."  Weaver, 137 S. Ct. at 1913.  None is present here.

no substantial likelihood of a miscarriage of justice. See Weaver, 137 S. Ct. at 1913.

5. Ineffective assistance of counsel. The defendant argues that trial counsel's failure to advocate for a lesser verdict of murder in the second degree, based on insufficient evidence of deliberate premeditation, rendered her representation of the defendant constitutionally ineffective. "Because the defendant was convicted of murder in the first degree, we do not evaluate his ineffective assistance [of counsel] claim under the traditional standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974)." Commonwealth v. Denson, 489 Mass. 138, 150 (2022), quoting Commonwealth v. Ayala, 481 Mass. 46, 62 (2018). Instead, we analyze such a claim under the more favorable standard of § 33E to determine whether trial counsel's alleged ineffective assistance created a substantial likelihood of a miscarriage of justice. Denson, supra at 150-151. See Commonwealth v. Seino, 479 Mass. 463, 472 (2018). More specifically, "we determine whether defense counsel erred in the course of the trial and, if so, 'whether that error was likely to have influenced the jury's conclusion.'" Id. at 472-473, quoting Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014). "[T]he defendant bears the burden of demonstrating both error and

harm."  Seino, supra at 473, citing Commonwealth v. Barbosa, 477 Mass. 658, 674 (2017).

The defendant argues that where this court already has decided that no reasonable juror could have found that the defendant acted in self-defense, defense counsel's failure to advocate for a guilty verdict for murder in the second degree left the defendant without any true defense at all, see Commonwealth v. Haggerty, 400 Mass. 437, 441-442 (1987), and thus, constitutionally was ineffective.

"Where, as here, a claim of ineffective assistance of counsel is based on a strategic decision, we must determine whether that decision was manifestly unreasonable such that 'lawyers of ordinary training and skill in the criminal law' would not consider it competent."  Commonwealth v. Rhodes, 482 Mass. 823, 826 (2019), quoting Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017).  This inquiry "involves both temporal and substantive considerations." Kolenovic, supra.  "The temporal consideration limits the effect of hindsight by requiring a focus on the point in time when counsel made the challenged strategic decision."  Id., citing Commonwealth v. Glover, 459 Mass. 836, 843 (2011).  Such limitation allows us to "make 'every effort . . . to eliminate the distorting effects of hindsight.'"  Glover, supra, quoting Commonwealth v. Fenton F., 442 Mass. 31, 38 (2004).

At trial, defense counsel's primary defense was self-defense. Defense counsel had anticipated that Omar Sierra would testify that the defendant told him shortly after the shooting, "[the victim] was coming at me, he was coming at me, so I had to shoot him." This evidence was excluded. Defense counsel nonetheless proceeded with the theory of self-defense. During her closing argument, she told the jury, "[T]his case from beginning to end, from beginning to end, screams of self-defense, screams of self-defense." She repeated that argument throughout her closing.[20]

In our previous decision, however, we held that self-defense was not legally available in the circumstances of this case because the defendant failed to retreat where he undoubtedly had reasonable means to do so. See Yat Fung Ng, 489 Mass. at 254 (self-defense unavailable where defendant had access to vehicle as reasonable means of retreat but instead chose to reach inside vehicle to retrieve firearm to shoot victim). Defense counsel's decision to proceed solely on the legally untenable theory of self-defense after the exclusion of

---

[20] In her closing argument, defense counsel also challenged the element of malice, one of the essential elements of murder in both the first and second degrees. More specifically, defense counsel stated: "What [the prosecution does] to try to prove that my client committed this crime with some sort of malice is pathetic." This only further supports the conclusion that defense counsel wanted the jury to focus their attention solely on an acquittal.

Sierra's testimony, whether strategic or not, was "manifestly unreasonable" and constituted error. Rhodes, 482 Mass. at 826.

However, although defense counsel committed a manifestly unreasonable error at trial, the error warrants reversal only if it created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Montrond, 477 Mass. 127, 135 (2017). See also Seino, 479 Mass. at 472. Here, the error likely would not have influenced the jury's conclusion, and thus would not have created a substantial likelihood of a miscarriage of justice because, as discussed in part 7, infra, the evidence of deliberate premeditation supporting a conviction of murder in the first degree was strong. See Montrond, supra at 135-136 (trial counsel's decision not to introduce evidence of defendant's intoxication did not create substantial likelihood of miscarriage of justice on defendant's conviction of murder in first degree on theory of deliberate premeditation, where Commonwealth presented strong evidence of motive).

Furthermore, defense counsel's rigorous advocacy focused the jury on self-defense. In addition, the judge instructed the jury on self-defense, an instruction to which the defendant was not entitled given his failure to use reasonable means of retreat. See Yat Fung Ng, 489 Mass. at 254. Where the error awarded a benefit to the defendant to which he was not entitled, and where there was strong evidence of deliberate premeditation,

the error likely would not have influenced the jury's conclusion and thus did not result in a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Kirwan, 448 Mass. 304, 315 (2007) (no substantial likelihood of miscarriage of justice where trial error benefitted defendant).  See also Seino, 479 Mass. at 472.

6.  Life sentence without possibility of parole.  The defendant argues that a sentence of life without the possibility of parole constitutes cruel or unusual punishment in violation of art. 26 of the Declaration of Rights, because the defendant was twenty-four years old at the time he committed the murder and was not afforded an individualized sentencing hearing as described in Miller v. Alabama, 567 U.S. 460 (2012), and Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655 (2013), S.C., 471 Mass. 12 (2015).  We disagree.

"The touchstone of art. 26's proscription against cruel or unusual punishment . . . [is] proportionality."  Commonwealth v. Concepcion, 487 Mass. 77, 86 (2021), quoting Commonwealth v. Perez, 477 Mass. 677, 683 (2017).  For a sentence "[t]o reach the level of cruel [or] unusual, the punishment must be so disproportionate to the crime that it shocks the conscience and offends fundamental notions of human dignity."  Concepcion, supra, quoting Commonwealth v. LaPlante, 482 Mass. 399, 403

(2019).  The defendant bears the burden of proving disproportionality.  Concepcion, supra.

In Diatchenko, 466 Mass. at 673, this court concluded that a mandatory sentence of life without parole for juveniles convicted of murder in the first degree violates art. 26.  In light of the available scientific research on adolescent brain development, it was clear that "the brain of a juvenile is not developed fully, either structurally or functionally, by the age of eighteen."  See id. at 670.  Juveniles, therefore, may possess "diminished culpability and greater prospects for reform," suggesting that they may be "less deserving of the most severe punishments" (citation omitted).  Id.  As such, we held that juveniles ought to be afforded a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation, as life imprisonment without possibility of parole for this narrow group of criminal defendants violated the prohibition against cruel or unusual punishment in art. 26.  See id. at 670-671.  We specifically limited our holding in Diatchenko only to those individuals under the age of eighteen who are faced with mandatory sentences of life without parole for murder in the first degree.  Id. at 673 n.17.  The exception to parole eligibility for those "individuals who are eighteen years of age or older at the time they commit murder in the

first degree" undoubtedly still remained valid throughout the Commonwealth.[21]  Id.

Here, the defendant was twenty-four years old at the time he murdered the victim.  Aside from the defendant's age, however, and his claim that he was only a young adult at the time he committed the murder, the defendant has provided no evidence of any circumstance which plausibly could suggest that the known research on adolescent brain development, and its impact on adolescent behavior, ought to extend to individuals who are the age of twenty-four.  Cf. Garcia, 482 Mass. at 412-413 (defendant presented at least some expert testimony that suggested that some brain functions do not develop fully until around age twenty-two).  Thus, we discern no error.

7.  Relief pursuant to G. L. c. 278, § 33E.  Finally, the defendant argues that because of the circumstances of this case, justice requires this court to reduce the defendant's conviction to murder in the second degree after plenary review of the record pursuant to § 33E.  We decline to disturb the jury's verdict in the circumstances of this case.

---

[21] Since our holding in Diatchenko, 466 Mass. at 670-671, we have declined to extend this protection to individuals who are over the age of eighteen.  See Garcia, 482 Mass. at 413.  See also Commonwealth v. Gamboa, 490 Mass. 294, 311 n.13 (2022); Denson, 489 Mass. at 154; Commonwealth v. Colton, 477 Mass. 1, 18-19 (2017); Chukwuezi, 475 Mass. at 610.

This court has used its extraordinary authority pursuant to § 33E "sparingly and with restraint," reducing convictions "only in the most compelling circumstances" (citation omitted). Commonwealth v. Billingslea, 484 Mass. 606, 619-620 (2020). See Hartung, The Limits of "Extraordinary Power": A Survey of First-Degree Murder Appeals under Massachusetts General Laws Chapter 278, Section 33E, 16 Suffolk J. Trial & App. Advoc. 1, 9 (2011) (discussing low reversal rate by this court in § 33E cases). See also Allen, Section 33E Survives the Death Penalty: Why Extraordinary Review of First-Degree Murder in Massachusetts Serves No Compelling Purpose, 45 Suffolk U. L. Rev. 979, 993 (2012) (same). "Our power under [§ 33E] directs us to consider a defendant's entire case, taking into account a broad range of factors, when determining whether a conviction of murder in the first degree was a miscarriage of justice that warrants a reduction in the degree of guilt." Concepcion, 487 Mass. at 94, quoting Commonwealth v. Berry, 466 Mass. 763, 770 (2014). We emphasize that in conducting plenary review pursuant to § 33E, "[o]ur duty is not to sit as a second jury but, rather, to consider whether the verdict returned is consonant with justice." Concepcion, supra, quoting Commonwealth v. Dowds, 483 Mass. 498, 512 (2019).

This court, however, has considered a number of factors to determine whether a reduction in a jury's verdict is in the

interests of justice.  See Commonwealth v. Colleran, 452 Mass. 417, 431-432 (2008).  These factors include whether (1) "the intent to kill was formed in the heat of sudden affray or combat"; (2) "the homicide occurred in the course of a senseless brawl"; (3) "a minor controversy exploded into the killing of a human being"; (4) "the entire sequence reflects spontaneity rather than premeditation"; (5) "the defendant carried a weapon to the scene or left the scene after an initial confrontation and returned with a weapon to kill the victim"; (6) "the victim was the first aggressor"; (7) "the defendant and the victim were strangers or, if only acquaintances, whether there had been prior trouble between them"; (8) "the defendant and the victim had enjoyed a good relationship prior to the killing"; (9) "alcohol or drugs were involved"; and (10) "the personal characteristics of the defendant, such as age, family, [work ethic], disability, and lack of prior criminal record" (quotations, citations, and alterations omitted).  Id.  This list is not exhaustive of all possible considerations that may arise in the future.

Before we examine whether the circumstances of the defendant's conviction warrant a reduction in verdict, we note that many of this court's previous reversals and reductions in verdict, pursuant to § 33E review, are grounded in particular reversible error, most often erroneous jury instructions, and do

not evidence a practice of this court to conclude, sua sponte, that the facts of the murder are so unusual and compelling that a reduced verdict is more consonant with justice.  See Hartung, supra at 9-11.  Instead, where there exists no clear reversible error, and where a defendant merely urges this court that the unique circumstances of the case warrant a reduction in the verdict pursuant to § 33E, we have exercised our discretion to reduce a defendant's verdict far less, and we emphasize that we will continue to do so only in the most extraordinary and compelling factual circumstances.  See Billingslea, 484 Mass. at 619 (from 2011 to 2019, this court exercised § 33E powers as sole means of reversal in only four cases, of approximately 296 cases and thirty-seven total reversed convictions).  See also Colleran, 452 Mass. at 431, quoting Commonwealth v. Williams, 364 Mass. 145, 151 (1973) ("Regard for the public interest impels us to use with restraint our power under § 33E to modify the jury's verdict").

In Colleran, 452 Mass. at 433, we concluded that, while there existed sufficient evidence for the jury to return a verdict of murder in the first degree by means of deliberate premeditation, "the heft of the evidence [fell] more squarely with murder in the second degree."  There, the defendant suffered from profound depression and mental illness, which produced an illogical ideation serving as the motive for the

defendant's deliberate killing of her two and one-half year old daughter. See id. at 419, 432. The incident reflected spontaneity: it was not planned; no weapon was carried to the scene; no hostile relationship existed between the defendant and her child; the defendant "was in a stable family relationship, and gainfully employed"; and, although the defendant had used drugs before, there was no drug use in the five years before the murder, nor did the defendant possess any sort of criminal record. See id. at 433.

Thus, where "the evidence of premeditation was so intertwined with the defendant's mental illness, and where the case present[ed] multiple factors we have previously identified when exercising our power under § 33E," this court reduced the verdict to murder in the second degree, a verdict that was "more consonant with justice." Id. While mental illness alone generally is insufficient to reduce a verdict under § 33E, in recent years, this court has reduced convictions of murder in the first degree to murder in the second degree to account particularly for a defendant's mental health and severe mental illness issues. See Concepcion, 487 Mass. at 95-96 (defendant's mental condition, cognitive impairments, and young age rendered him ill-suited to resist pressure from other adult gang members to carry out shooting of victim). See also Dowds, 483 Mass. at 513 (defendant's two serious brain injuries as child produced

long-term brain damage and abnormal inability to control impulses, which weighed heavily in defendant's reckless killing of victim during unarmed robbery of victim's car). But see Commonwealth v. Whitaker, 460 Mass. 409, 421 (2011) (declined to reduce verdict where "defendant's psychological diagnosis, while significant, does not reach [a sufficient] level of severity, and there is no evidence that it was intertwined with the victim's killing").

There is nothing here to suggest that the defendant's killing of the victim was the result of mental illness such as in the aforementioned cases. Instead, the defendant's case more closely aligns with those cases in which a defendant is found guilty of murder in the first degree as a result of a "senseless brawl," see Commonwealth v. Ransom, 358 Mass. 580, 583 (1971), or "the heat of sudden affray or combat," that demonstrates "a minor controversy . . . explod[ing] into the killing of [another]," see Commonwealth v. Baker, 346 Mass. 107, 110, 119 (1963).

In Commonwealth v. Vargas, 475 Mass. 338, 365-366 (2016), this court determined that there were many Colleran factors present to justify reducing the verdict. In Vargas, the victim burst into his estranged wife's apartment and attacked both her and the defendant. Id. at 341. The victim knocked the defendant back, from the living room into the bedroom, and

jumped on top of him, which led to the defendant stabbing the victim in the use of excessive deadly force in self-defense. Id. at 341, 366-367.  In finding the defendant guilty of murder in the first degree, the jury rejected a theory of deliberate premeditation and, instead, found the defendant guilty of murder in the first degree on the theory of extreme atrocity or cruelty, "focus[ing] its inquiry exclusively on the altercation itself."  Id. at 365.  The lack of clear deliberate premeditation demonstrated that the killing "was the result of uncontrolled violent action."  Id. at 367.  This was exacerbated only further by the evidence that the victim was the initial aggressor; the victim was "much larger, trained in unarmed combat, and [was] enraged" at the time of the altercation; and, moreover, prior to using the knife in killing the victim, the defendant asked a nearby witness to call 911.  Id. at 365.  Therefore, where "[t]he sequence that led to the killing indicate[d] spontaneity, and reflect[ed] that the killing was more the product of sudden combat and the heat of passion than of malice," we found the case to be one of the unusual circumstances in which a reduction in the verdict from murder in the first degree to voluntary manslaughter was "more consonant with justice."  See id. at 366-367.

Here, the victim was unarmed during the entire altercation with the defendant.  Unlike in Vargas, the instant defendant was

the initial aggressor or, at the very least, was the individual who reignited the already dispersed altercation, by threatening the victim and his two friends with deadly force. Cf. Vargas, 475 Mass. at 365-366. Prior to the shooting, the victim here also neither had lunged at the defendant, like the victim in Vargas, nor used any physical force against the defendant beyond mere insults and vaguely threatening gestures. See Commonwealth v. Vatcher, 438 Mass. 584, 588 (2003) (mere insults insufficient to constitute adequate provocation to negate murder conviction).

Perhaps most important, however, for our analysis on whether the circumstances of the defendant's killing of the victim warrant a reduction in the verdict is the fifth factor found in Colleran, namely, "whether the defendant carried a weapon to the scene, . . . or left the scene after an initial confrontation and returned with a weapon to kill the victim." See Colleran, 452 Mass. at 431. In Coleman, 434 Mass. at 166-167, 173, this court denied relief under § 33E in almost identical circumstances to the present case. There, the defendant was involved in an altercation where punches were thrown outside a nightclub. Id. at 166. The defendant left the brawl and went to a nearby car, where another man told the defendant, "It ain't over. It ain't over. Pop the trunk. Pop the trunk." Id. at 168. The defendant then retrieved a gun from the trunk. Id. at 166. While the victim had followed the

defendant to the car, the victim was unarmed.  Id.  Ultimately, the defendant turned toward the victim and shot him at close range.  Id. at 168.

In Commonwealth v. Whipple, 377 Mass. 709, 712, 714-715 (1979), a similar circumstance unfolded, where a defendant was convicted of murder in the first degree by means of deliberate premeditation where a defendant disengaged from a fistfight, obtained a gun from a nearby car, returned to the scene of the previous altercation in short time, and shot the victim.  Both Coleman and Whipple demonstrate that where this court has been faced with circumstances in which a defendant has left the scene after an initial confrontation, only to return with a deadly weapon to kill the victim, we have "regularly denied § 33E relief."  Whipple, supra at 715.  See Coleman, 434 Mass. at 168-169, 173.  See also Commonwealth v. Stillwell, 366 Mass. 1, 5-6 (1974), cert. denied sub nom. McAlister v. Massachusetts, 419 U.S. 1115 (1975) (no reduction in verdict where defendant had dispute with victim over ten-dollar dice game, retrieved gun from his house, and returned to resume argument and shoot victim); Commonwealth v. Pratt, 360 Mass. 708, 715 (1972) (no reduction in verdict where defendant argued with victim, went home to retrieve gun, and shortly thereafter shot victim seven times).

The facts of the defendant's case glaringly are similar to those of Coleman and Whipple, both of which are instances where this court declined to exercise its extraordinary § 33E powers. See Coleman, 434 Mass. at 166-167; Whipple, 377 Mass. at 714-715. Here, after the altercation outside the instant bar had concluded, and security had dispersed the two groups of individuals that had been fighting, the defendant confronted the victim, Lee, and Miranda, and began to threaten them with a gun. More specifically, the defendant said to the victim and his friends, "You think you're bullet proof, you think you're bullet proof"; "What's up tough guys?  You think you're bullet proof? I got something for you.  I got something for you in my trunk. You think you're bullet proof?"[22]  As the victim yelled back, the defendant walked to his own car, which led the victim to say, "You better run."  The defendant picked up his pace toward his car, walking purposefully.  When a nearby witness told the defendant something to the effect of "It's over," the defendant responded with either "It's not over for me" or "I have business."  In that moment, as he walked toward the car, the defendant "formed the plan to kill."  See Coleman, 434 Mass. at 168.  The defendant retrieved a gun from his trunk, turned to the defendant, raised the gun, and pointed it at the victim,

_____

[22] At trial, Lee testified that what the defendant was referring to in the trunk of his car was a firearm.

saying, "Yeah, you want this?  You want this?"  The victim responded, "What are you gonna do, shoot me?  Go ahead, shoot me," as well as "Go ahead, do it.  Do it."  As the victim antagonized the defendant to shoot him, the defendant fired at the victim, hitting him with a single shot that landed one and one-half inches to the left of the middle of the victim's forehead.

The defendant argues that this court nonetheless should look to his personal characteristics as justification for a reduction in the verdict to murder in the second degree.[23]  More specifically, the defendant argues that at the time of the crime, he was only twenty-four years of age, he was employed gainfully by a university as a full-time security guard, he was enrolled as a student at a community college, he was honorably discharged from the United States Army, and he had no previous criminal record.[24]  While we can appreciate the fact that these

---

[23] The defendant also argues that where he received deficient legal representation and where there were multiple errors throughout his trial, this court ought to reduce the verdict.  Where we already have concluded, supra, that the defendant neither received constitutionally ineffective assistance of counsel nor suffered from any other reversible trial error, we decline to do so.

[24] The defendant also urges this court to look at the fact that he had been drinking prior to killing the victim, as another factor to consider for a reduction in the verdict.  The mere fact that the defendant's alleged "anger and fear [were] somewhat compounded and heightened by drink" necessarily does

factors possibly could weigh in the defendant's favor, see Colleran, 452 Mass. at 431-432, we do not believe they are sufficient to warrant a reduction in the verdict to murder in the second degree. The circumstances surrounding the killing demonstrate that the defendant "disengaged after the initial encounter, but then . . . chose to return." See Whipple, 377 Mass. at 715. He did so despite neither being physically injured in the altercation nor even being involved in the initial altercation outside the bar. The defendant deliberately left the scene to retrieve a weapon, to confront an unarmed victim, to "return[] to do murderous work." See id. See also Stillwell, 366 Mass. at 5-6 (defendant "left the scene for a [short] period of time to obtain [a] weapon[], then returned to the scene and committed the homicide[]").

The overwhelming evidence of deliberate premeditation boiled down to the defendant's decision to "reach[] for his firearm rather than his keys." Yat Fung Ng, 489 Mass. at 254. The defendant unnecessarily caused a mere verbal argument, one in which he was not even involved and that initially began with the childish verbal banter of "Yankees suck," to explode into a killing through the unnecessary and unjustified use of deadly force. Despite his claim that he was acting as a "good

_____

not warrant a reduction in verdict to murder in the second degree. See Whipple, 377 Mass. at 715.

[S]amaritan," the defendant antagonized and reignited an altercation that had ended.  Most importantly, he retained a clear, short period of reflection and premeditation after the original verbal altercation, in which he very well could have gotten into his car and left the bar; instead, he chose to arm himself, because the situation was not "over for [him]," and he took care of the so-called "business" that he had with the victim, which unfortunately ended in the victim's death.

The factual circumstances surrounding the defendant's case are not so extraordinary and compelling as to justify a reduction in verdict pursuant to § 33E.  See Billingslea, 484 Mass. at 620.  Accordingly, after plenary review of the entire record, we discern it necessary to exercise restraint over our extraordinary powers pursuant to G. L. c. 278, § 33E, and we affirm the defendant's convictions.

Judgments affirmed.

Order denying motion for a
  new trial affirmed.